LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; Red Cliff Band of Lake Superior Chippewa Indians; Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin; St. Croix Chippewa Indians of Wisconsin; Bad River Band of the Lake Superior Chippewa Indians: Lake Du Flambeau Band of Lake Superior Chippewa Indians, Plaintiffs,

v.

STATE OF WISCONSIN, Wisconsin Natural Resources Board, Carroll D. Besadny, James Huntoon, and George Meyer, Defendants.

No. 74–C–313.

United States District Court,
W.D. Wisconsin.

Feb. 18, 1987.

James E. Zorn, Hayward, Wis., for Lac Courte Oreilles Band of Lake Superior Chippewa Indians.

Milton Rosenberg, Madison, Wis., for Red Cliff Band of Lake Superior Chippewa Indians.

Earl Charleton, Milwaukee, Wis., for Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin.

Howard Bichler, Webster, Wis., for St. Croix Chippewa Indians of Wisconsin.

Candy L. Jackson, Odanah, Wis., for Bad River Band of the Lake Superior Chippewa Indians.

Kathryn Tierney, James Jannetta, Lac du Flambeau, Wis., for Lake Du Flambeau Band of Lake Superior Chippewa Indians.

Mary V. Bowman, Charles Larsen, James McDermott, Asst. Atty. Gen., Madison, Wis., for defendants.

JAMES E. DOYLE, District Judge.

This is a civil action brought initially by the Lac Courte Oreilles Band of Lake Superior Chippewa Indians (LCO) to define plaintiffs' treaty-based, off-reservation usufructuary rights (generally, rights to hunt, fish, and gather) and to enjoin the defendants from interfering with the exercise of those rights. The lawsuit is strictly confined to off-reservation activities. Since the filing of the original complaint, other bands have intervened as parties plaintiff: the Red Cliff, Bad River, Mole Lake, Lac du Flambeau, and St. Croix. For brevity, I will treat all the plaintiffs as if they had been parties from the start and as if they had all taken the positions taken by LCO while it was the sole plaintiff. Defendants are the State of Wisconsin; the Board of the Wisconsin Department of Natural Resources; Carroll Besadny, Secretary of the Department of Natural Resources; James Huntoon and George Meyer, both administrators in the Department of Natural Resources.

Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1362.

## PROCEDURAL HISTORY

When plaintiffs commenced this lawsuit, they claimed that treaties entered into by the various bands and the United States in 1837 and 1842 reserved to the plaintiffs usufructuary rights which they could exercise on the lands they ceded to the United States. They claimed that those reserved usufructuary rights have never been lawfully abrogated or extinguished, and that the state of Wisconsin is unlawfully interfering with those rights.

On cross-motions for summary judgment, I granted judgment for defendants, holding that the off-reservation usufructuary rights were not extinguished by the Executive Order of 1850, but were extinguished by the Treaty of September 30, 1854. *United States v. Bouchard,* 464 F.Supp. 1316 (W.D.Wis.1978).

Both parties appealed. The court of appeals framed the issues on appeal as follows:

(1) what was the nature of the usufructuary rights enjoyed by the LCO band pursuant to the treaties of 1837 and 1842;

(2) whether those rights were extinguished by the Removal Order of 1850; and if not,

(3) whether those rights were released or extinguished by the Treaty of 1854.

*Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341, 344 (7th Cir.) *(LCO I), cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983).

In *LCO I* the court of appeals held that neither the Executive Order of 1850 nor the Treaty of 1854 had extinguished plaintiffs' off-reservation usufructuary rights reserved in the treaties of 1837 and 1842, and that those rights continue to exist. *Id.* at 364–65. The court remanded the case for a determination of the permissible scope of state regulation of the Chippewa's exercise of those rights. *Id.* at 365.

The state then petitioned the court of appeals for rehearing and rehearing *en banc,* requesting clarification. In particular, the state asked whether it was free to impose its hunting, fishing, and firearms laws upon the Chippewa in those portions of the ceded lands privately owned. On March 8, 1983, the court denied the state's motion for rehearing and rehearing *en banc,* but sought to clarify its ruling by adding the following language to the text of its opinion and by adding the following footnote (numbered 14):

The exercise of these [usufructuary] rights is limited to those portions of the ceded lands that are not privately owned.[14]

\*　　\*　　\*　　\*　　\*　　\*

[14] This court has understood the LCO band's argument to be limited to those portions of the ceded lands that have not passed into private ownership. To the extent that the LCO band might be claiming a broader right—such as the right to engage in usufructuary activities on land that is privately owned but utilized for sport hunting and fishing—we find that the claim is inconsistent with the Indians' understanding at the time of the cession treaties that their rights could be limited if the land were

needed for white settlement, *see* Section I, *supra.*

*Id.*[1]

On remand, at plaintiff's request, this court entered a partial judgment on March 6, 1984 to conform to the opinion of the court of appeals. That partial judgment read in part:

1. The Lac Courte Oreilles Band of Lake Superior Chippewa Indians reserved for its members usufructuary rights within the territory ceded by the Lake Superior Chippewa to the United States in the Treaty of 1837, 7 Stat. 536, and in the Treaty of 1842, 7 Stat. 591.

2. The usufructuary rights so reserved were not extinguished or relinquished by the 1850 Executive Order of the President of the United States or by the Treaty of 1854, 10 Stat. 1109.

3. The usufructuary rights so reserved continue to exist, limited to those portions of the ceded lands that were not privately owned as of March 8, 1983.

4. This court retains jurisdiction further to define the usufructuary rights so reserved and to determine the extent to which the State of Wisconsin may regulate them.

Defendants appealed from the partial judgment, objecting to paragraph three in particular. In *Lac Courte Oreilles Band v. State of Wisconsin,* 760 F.2d 177 (7th Cir.1985) (*LCO II*), the court declared that I had been too literal in my reading of *LCO I.* The court of appeals amplified its language in *LCO I* (its amplification will be discussed later in this opinion), it vacated the partial judgment, and it remanded the case once again. This remand set the stage for a trial on the merits.

The mandate of the court of appeals is to consider the permissible scope of state regulation of plaintiffs' exercise of their treaty-based, off-reservation usufructuary rights in the ceded territory. Following *LCO I* the parties and I agreed that the trial on the merits would proceed in two phases. Phase I would determine what activities the tribes were engaged in at the time of the treaties, what their usufructuary rights are today, and whether there is a basis for any state regulation of those rights. If it were to be determined that there is a basis for some regulation, phase II would determine the nature and extent of that regulation. Phase I has been spoken of by counsel and the court as the declaratory phase, phase II, the regulatory phase.

On January 13, 1984, plaintiffs submitted their Proposed Schedule of Further Proceedings, outlining the issues they believed must be decided in phase I:

(1) a delineation of the types of activities which tribal members may undertake under the treaties at issue;

(2) a determination of the uses to which tribal members may put the natural resources subject to the treaty right;

(3) a declaration of the boundaries within which these activities may occur;

(4) an allocation of the natural resource base between tribal members and nonmembers; and

(5) a determination of the state's authority to regulate treaty-based usufructuary rights.

On November 13, 1984, I directed that in phase I of the trial I would decide the issues plaintiffs proposed on January 13, 1984.

Later, in light of *LCO II,* the parties were given the opportunity to submit additional issues to be decided in phase I. The submissions by the opposing parties substantially coincided:

(1) what types of public lands are not, because of the uses made of them, compatible with the exercise of treaty usufructuary rights;

(2) whether the exercise of the usufructuary rights on publicly owned land, which was previously privately owned, has been extinguished as a

---

1. Careful perusal of section I of the court's opinion in *LCO I* reveals no specific or even non-specific findings or discussion concerning the presence or absence of such an understanding on the part of the Chippewa.

matter of law, and if so, whether there are exceptions; and

(3) whether any privately owned land is subject to the exercise of the usufructuary rights.

The trial on the merits of phase I commenced on December 9, 1985. My findings of fact and conclusions of law below are based on the evidence presented in phase I. I emphasize that no attempt is made now to discuss the extent to which the state may regulate plaintiffs' exercise of their off-reservation usufructuary activities. That determination awaits phase II.

Pursuant to Fed.R.Civ.P. 52(a), I find as fact those matters set forth in the following section of this opinion, under the heading "FACTS."

## FACTS

### The Chippewa

The plaintiff bands are recognized by the Secretary of the Interior, each with a government organized pursuant to the provisions of the Indian Reorganization Act, 25 U.S.C. §§ 461 et seq. The bands bring this action on behalf of themselves and their members. The bands are political successors in interest to the bands of Lake Superior Chippewa who were parties to the treaties of 1837 and 1842.

The Chippewa are part of a group of the central Algonquian Indians. The central Algonquian include the Chippewa, Potowatomi, Ottawa, Algonquian proper, Illinois and Miami tribes.

The Chippewa in the ceded territory were hunters and gatherers. Their hunting activities included fishing and fowling in addition to traditional notions of hunting. The Chippewa harvested virtually everything on the landscape. They had some use or uses for all the flora and fauna in their environment, whether for food, clothing, shelter, religious, commercial, or other pur-poses. The Chippewa relied on hunting and gathering for their subsistence.[2] They harvested resources for their own immediate, personal use and for use as trade goods in commerce. The Chippewa traded goods for items which contributed to their subsistence. Neither in harvesting resources for commercial purposes nor in harvesting resources for their own use did the Chippewa strive for more than a moderate, satisfactory living. They were indifferent to acquiring wealth beyond their immediate needs.

The Lake Superior Chippewa developed two different types of adaptations to the natural resources around them: the lakeshore and the interior. The lakeshore adaptation was centered around fishing, particularly whitefish and lake trout fishing, but the lakeshore bands also relied on hunting moose, deer, bear, and other animals. Like the interior bands, they collected sap from sugar maple trees for syrup. They maintained small gardens along the lakeshore.

The interior adaptation was centered around small summer villages on the shores of inland lakes. During the summer months, the interior bands maintained small gardens, hunted, and gathered. In late summer and early fall they harvested wild rice for a winter food source. The interior bands scattered during the winter months to hunt; in the spring they congregated again at the sugaring places.

The Chippewa were divided into independent bands. Each band had its own chief and each occupied a fairly distinct territory. The territories were based on use by a family or a group of families or by the natural resources of the territory. The roving habits of the Chippewa as a whole and the Chippewa's territoriality tended to disperse the Indian population in the ceded territory while avoiding the exhaustion of natural resources. This dispersal diminish-

---

**2.** For purposes of this opinion, "subsistence" is defined as the means of subsisting, or what is necessary to support life, including food, cloth-ing and shelter. Materials used for religious purposes are included.

ed, however, as the Chippewa became increasingly involved in trade.

The organizational features of the bands were based primarily on principles of kinship. Although each band had a chief, Chippewa society was quite egalitarian. Decisions were made by consensus. The power and influence of the chiefs varied, depending on the chiefs' individual qualities that were respected by the bands and valued in chiefs.

As among Chippewa members, the Chippewa economy was a system of reciprocity. An important element of this system was sharing. The scarcer a resource became, the more willing the Chippewa were to share it. Another important aspect of their economy was that it lacked the profit incentive integral to western capitalism. The motive for the Chippewa in their working lives was to satisfy their immediate needs rather than to accumulate material goods and surpluses of food.[3]

Although the non-Indians[4] attempted to persuade the Chippewa to adopt agriculture as a way of life, the attempt was unsuccessful. The Chippewa never became farmers or adopted the sedentary lifestyle urged upon them.

### The Defendants

The state of Wisconsin is a sovereign state of the United States. The Natural Resources Board is the public body charged with the direction and supervision of the Wisconsin Department of Natural Resources, an executive agency created by Wis.Stat. § 15.34. Carroll D. Besadny is the Secretary of the Wisconsin Department of Natural Resources. James Huntoon is the Administrator of the Division of Resource Management in the Department of Natural Resources. George Meyer is the Administrator of the Division of Enforce-

ment in the Department of Natural Resources.

### The Treaties

In 1837 and 1842, the United States entered into treaties with the Lake Superior Chippewa for cessions of land.[5] Although the Chippewa ceded certain lands to the United States, they reserved to themselves the right to exercise their hunting and fishing activities in the ceded territory. Article 5 of the Treaty of 1837 provides:

> The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States.

Article II of the Treaty of 1842 provides:

> The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.

In *LCO I*, the court of appeals interpreted the treaties of 1837 and 1842 to authorize termination of the Chippewa's right to exercise their usufructuary rights in the ceded territory only if they "misbehaved" by harassing non-Indian settlers. 700 F.2d at 357. In 1850 the President of the United States issued an executive order which purported to revoke the Chippewa's usufructuary rights in the ceded territory. Because the 1850 removal order was not a response to Chippewa "misbehavior," the court of appeals held it had no legal effect. *Id.* at 362.

In 1854 the United States again treated

---

3. There were exceptions to this. The Chippewa did store up food for the winter months, or if they anticipated war.

4. I will use the term "non-Indian," rather than "white," except as use of the latter term is re-

quired by its appearance in the pertinent documents themselves, such as the Treaty of 1842.

5. Treaty of 1837, 7 Stat. 536; Treaty of 1842, 7 Stat. 591. The text of the treaties is set forth in

with the Chippewa in northern Wisconsin.[6] The Treaty of 1854 granted reservations to the Chippewa on portions of the land they had ceded to the United States in 1837 and 1842. In *LCO I*, the court of appeals held that: the Chippewa understood that the Treaty of 1854 did not abrogate the rights they had reserved in 1837 and 1842 to hunt and fish throughout the ceded territory; the 1854 treaty must be construed to conform to this Chippewa understanding; and the 1854 treaty did not abrogate those rights in that part of the ceded territory which was not to become part of a reservation. *Id.* at 362–65.

When they agreed to the treaties of 1837 and 1842, the Chippewa's understanding was as follows: They were guaranteed the right to make a moderate living off the land and from the waters in and abutting the ceded territory and throughout that territory by engaging in hunting, fishing, and gathering as they had in the past and by consuming the fruits of that hunting, fishing, and gathering, or by trading the fruits of that activity for goods they could use and consume in realizing that moderate living. They were aware that settlement by non-Indians had occurred and was occurring. At the time of the 1837 and 1842 treaties, the extent of such settlement was minimal. The Chippewa would keep their distance from the non-Indians. The Chippewa would be competing to some degree with the non-Indians for the kind of natural resources the Chippewa had been exploiting. This competition and accommodation would be on a scale which would not threaten in any degree the moderate living the Chippewa would continue to enjoy from the exercise of their usufructuary rights and their trading. This guarantee was permanent, except that they could be removed from the ceded lands if they misbehaved and except that the non-Indians might decide to reopen treaty negotiations with them. In the latter event the balance of power would be severely adverse to them

and they might be compelled by that balance of power to enter into some new agreement less desirable to them. In the absence of a lawful removal order or in the absence of fresh agreement on the part of the Chippewa, the presence of non-Indian settlers would not require the Chippewa to forego in any degree that level of hunting, fishing, and gathering, and that level of trading necessary to provide them a moderate living off the land and from the waters in and abutting the ceded territory and throughout that territory.

### The Ceded Territory

As of 1837 and 1842, Wisconsin was ecologically divided between a northern forest and a southern forest, with a "tension zone" of mixed character between the two zones. The boundary of the ceded territory is that shown in joint exhibit 54. The ceded territory is in the area of the northern forest. The ceded territory contains highlands drained by short rivers that flow into Lake Superior. The highlands have a mixed coniferous-deciduous forest. The lowlands in the ceded territory have rivers that flow to the south. A coniferous forest predominates in the lowlands.

The northern part of the state of Wisconsin is characterized by cool summers and high annual snowfall. It receives between 90 and 140 frost-free growing days. Generally, the ceded territory receives fewer than 120 frost-free growing days in a year. In general, corn cannot be grown reliably in areas which receive 120 or fewer frost-free growing days per year.

### Resources Used

As of 1837 and 1842, the Chippewa exploited virtually every resource in the ceded territory. Among the mammals the Chippewa hunted at treaty time were white-tailed deer, black bear, muskrat, beaver, marten, mink, fisher, snowshoe hare, cottontail rabbit, badger, porcupine, moose,

---

appendix B to my opinion in *United States v. Bouchard,* 464 F.Supp. at 1364–69.

**6.** Treaty of 1854, 10 Stat. 1109. For the text of the treaty see appendix B, 464 F.Supp. at 1370–76.

woodchuck, squirrel, raccoon, otter, lynx, fox, wolf, elk, and bison.

Among the birds the Chippewa hunted were ducks, geese, songbirds, various types of grouse, turkeys, hawks, eagles, owls, and partridges.

Among the fish the Chippewa harvested were, in Lake Superior, whitefish, herring, chubs, lake trout and turbot; and, in-shore, suckers, walleye, pike, sturgeon, muskie, and perch.

The Chippewa also harvested a large number of plants and plant materials, including: box elder, sugar maple, arum-leaved arrow-head, smooth sumac, staghorn sumac, wild ginger, common milkweed, yellow birch, hazelnut, beaked hazelnut, nannyberry, climbing bitter-sweet, large-leaved aster, Philadelphia fleabane, dandelion, panicled dogwood, large toothwort, cucumber, Ojibwe squash, large pie pumpkin, gourds, field horsetail, bog rosemary, leather leaf, wintergreen, Labrador tea, cranberry, blueberry, beech, white oak, bur oak, red oak, black oak, corn, wild rice, Virginia waterleaf, shell bark hickory, butternut, wild mint, catnip, hog peanut, creamy vetchling, navy bean, lima bean, cranberry pole bean, lichens, wild onion, wild leek, false spikenard, sweet white water lily, yellow lotus, red ash, white pine, hemlock, brake, marsh marigold, smooth juneberry, red haw apple, wild strawberry, wild plum, pin cherry, sand cherry, wild cherry, choke cherry, highbush blackberry, red raspberry, large-toothed aspen, prickly gooseberry, wild black currant, wild red currant, smooth gooseberry, Ojibwe potato, hop, Virginia creeper, river-bank grape, red maple, mountain maple, spreading dogbane, paper birch, low birch, downy arrow-wood, woolly yarrow, white sage, alternate-leaved dogwood, wool grass, great bulrush, scouring rush, sweet grass, Dudley's rush, marsh vetchling, sweet fern, black ash, balsam fir, tamarack, black spruce, jack pine, Norway pine, arbor vitae (white cedar), hawthorn, shining willow, sphagnum moss, basswood, cat-tail, wood nettle, slippery elm, and Lyall's nettle, poison ivy, winterberry, mountain holly, sweet flag, Indian turnip, wild sarsaparilla, ginseng, spotted touch-me-not, blue cohosh, speckled elder, hound's tongue, marsh bellflower, harebell, bush honeysuckle, red elderberry, snowberry, highbush cranberry, white campion, yarrow, pearly everlasting, lesser cat's foot, common burdock, ox-eye daisy, Canada thistle, common thistle, daisy fleabane, Joe-Pye weed, tall blue lettuce, white lettuce, black-eyed Susan, golden ragwort, entire-leaved groundsel, Indian cup plant, fragrant golden-rod, tansy, cocklebur, bunch berry, tower mustard, marsh cress, tansy-mustard, squash, wild balsam-apple, hare's tail, wood horsetail, prince's pine, flowering spurge, golden corydalis, giant puffball, wild geranium, rattlesnake grass, blue flag, wild bergamot, heal-all, marsh skullcap, white sweet clover, reindeer moss, northern clintonia, Canada mayflower, small Solomon's seal, star-flowered Solomon's seal, carrion flower, twisted stalk, large flowered bellwort, ground pine, Canada moonseed, heart-leaved umbrella-wort, yellow water lily, great willow-herb, evening primrose, Virginia grape fern, yellow ladies' slipper, rein orchis, adder's mouth, bloodroot, white spruce, common plantain, Carey's persicaria, swamp persicaria, curled dock, shield fern, female fern, sensitive fern, red baneberry, Canada anemone, thimble-weed, wild columbine, gold thread, bristly crowfoot, cursed crowfoot, purple meadow rue, agrimony, large-leaved aven, rough cinquefoil, marsh five-finger, smooth rose, high bush blackberry, meadow-sweet, steeple bush, goose grass, small cleaver, small bedstraw, prickly ash, balsam poplar, large toothed aspen, quaking aspen, crack willow, bog willow, pitcher-plant, butter and eggs, cow wheat, wood betony, mullein, moosewood, musquash root, cow parsnip, sweet cicely, wild parsnip, black snakeroot, Canada violet, American dog violet, speckled alder, sweet gale, goldthread, bluewood aster, horseweed, Canada hawkweed, fragrant goldenrod, shin leaf, sessile-leaved bellwort, slender ladies' tresses, and starflower.

The Chippewa harvested other miscellaneous resources, such as turtles and turtle eggs.

The most important game for the Chippewa was the white-tailed deer.

### Harvest Methods

Deer were hunted by the Chippewa by shooting with firearms and bows and arrows, stalking, herding along fences, calling, baiting, shining, and snaring. They were hunted from boats and on land. Moose were hunted with firearms and bows and arrows, by stalking and shining. Bear were hunted with baited traps and firearms. Squirrels were hunted with bows and arrows. Both carnivorous and herbivorous animals were taken with snares; carnivorous animals were taken primarily with deadfalls.

Birds were hunted with guns using shot, by choking them with a noose, and by throwing stones at them.

Inland fishing was accomplished through the use of weirs, gaffs and spears, hoop nets, harpoons, hook and line, gillnets (particularly in the deep, cold lakes, but also in shallower lakes), seines, and decoys. The Chippewa used weirs and dams to restrict the movement of fish, which facilitated taking them by spear or net. Spears and harpoons were used to catch fish through the ice. Spearing, including spearing by torchlight, was among the most efficient and widely used methods of catching fish.

The Chippewa obtained sugar from the sugar maple trees. They tapped the trees in the spring when the sap was rising. The Chippewa used goods received in trade, such as axes and iron kettles, to collect sap. In 1860 maple sugar was the primary sweetener used in the United States.

### Commercial Activity

The Lake Superior Chippewa were engaged in the fur trade long before non-Indians came to Wisconsin to trade. From 1634 through the treaty period, when the Chippewa hunted on the lands ceded by the 1837 and 1842 treaties, they did so to meet their immediate personal needs and for the fur trade, both of which were factors in their subsistence.

Throughout the nineteenth century, the Chippewa were participants in an international market economy; they were the producers of commodities, primarily furs, and they controlled the resources that flowed into this economy. The exchange of commodities, furs in particular, was a way of life for both the Indians and non-Indians in the nineteenth century.

In 1825 non-Indians established a trading post on Madeline Island in Lake Superior. Before that, the American Fur Co. had established a trading post at Mackinaw Island.

The traders established inland posts where they had a warehouse and a dwelling. The Indians outfitted themselves for their hunting expeditions at the posts. In general, the Indians were permitted to have their purchases charged to an account. The traders kept track of the Indians' purchases and furs brought in to trade in record books. The Indians who lived near the posts dealt directly with the traders. Those who lived further away from the posts dealt with middlemen called "coureurs du bois."

In general, the Indians traded furs and food products to the traders. In return, they received a wide variety of goods: cloth, trinkets, blankets, shawls, kettles and other cooking utensils, gillnet twine, beads, jewelry, sewing utensils, guns and other weapons, combs, lead for making bullets, fire steels, and metal tools. The Indians traded most often for articles that were improvements on things they already had, or that offered more efficient ways of hunting and gathering and otherwise met their needs.

The Chippewa were aware of the principles of the Euro-American market economy. They understood competition and the ramifications of the fluctuations of supply and demand, as well as the value of tangible goods and services and labor.

The demand for furs and the concurrent increase in the Indians' exploitation of fur-bearing animals resulted at times in the scarcity of game. The fur trade also altered somewhat the hunting grounds of the

various bands. The distribution of families, which had matched the distribution of resources, was disrupted by the expansion of the fur trade. The locations of specific family or tribal hunting often changed because of population migrations or the opportunism of individual hunters to meet the demands of the fur trade.

Despite their participation in the Euro-American market economy, the Chippewa were not motivated by the hopes of profits and the accumulation of material goods. They continued to base their economic relationships with each other on kinship and reciprocity. The Chippewa developed an economic strategy that incorporated both their traditional economy and the market economy in such a way that they were able, on the one hand, to transact business with non-Indians who were participating in the Euro-American market economy and, on the other, to transact social and political relations with one another in the traditional manner.

To overcome the disaffection of the Chippewa for the accumulation of material goods and to force the Chippewa to continue hunting when they otherwise would have ceased for a time, the traders developed ways of making the Chippewa dependent on continued trading. The traders bought up storable goods such as maple sugar, rice, and rum, and traded such items for furs. When the Chippewa were hungry or wanted rum, the traders traded for such goods. Alcohol was found to be a particularly effective inducement to hunt, as it was storable, immediately consumable, and addictive.

The treaties themselves indicate that trade and cash were important parts of the Chippewa economy. The treaties of 1837 and 1842 provided for annuities to be paid to the Chippewa in cash and goods combined. The Treaty of 1842 specifically refers to "trade and intercourse with ... whites."

By 1854 the Chippewa were organized into semi-autonomous trading bands. By the 1890's, the Chippewa lived by combining traditional hunting and gathering, agri-culture, wage labor, and the sale of wood and other products. By 1900 the non-Indian cash-oriented economy was among the several sources of survival to which the Chippewa had adapted and from which they skimmed.

## OPINION

■ Indian treaties must be construed as the Indians understood them. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675–76, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979) (*Fishing Vessel Ass'n*); *LCO I,* 700 F.2d at 350. Ambiguities are to be resolved in favor of the Indians. *Winters v. United States,* 207 U.S. 564, 576–577, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908); *LCO I,* 700 F.2d at 350.

> And we have said we will construe a treaty with the Indians as "that unlettered people" understood it, and "as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection," and counter-poise the inequality, "by the superior justice which looks only to the substance of the right without regard to technical rules." How the treaty in question was understood may be gathered from the circumstances.

*United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905) (citations omitted).

■ The off-reservation usufructuary rights reserved by the Chippewa in the treaties of 1837 and 1842 continue to be effective today.

Plaintiffs enjoy greater rights to hunt, fish, and gather in the ceded territory than do non-Indians. As the Court stated in *United States v. Winans,* to interpret reservations of usufructuary rights in treaties of cession to have reserved to Indians only those rights they would enjoy today without the treaty "is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." 198 U.S. at 380, 25 S.Ct. at 664.

■ With certain exceptions, discussed below and to be addressed in phase II of this case, plaintiffs have the right to exploit virtually all the natural resources in the ceded territory, as they did at treaty time. Subject to agreements they may reach with the state of Wisconsin, or to unilateral action by the Congress, and subject to current and lawful state regulation, they may exploit these natural resources anytime.

■ Plaintiffs are not confined to the hunting and fishing methods their ancestors relied upon at treaty time. The method of exercise of the right is not static. Plaintiffs may take advantage of improvements in the hunting and fishing techniques they employed in 1842. *See United States v. Michigan,* 471 F.Supp. 192, 260 (W.D.Mich.1979), remanded on other grounds 623 F.2d 448 (6th Cir.1980), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981); *United States v. Washington,* 384 F.Supp. 312, 402 (W.D.Wash. 1974) (*Boldt I*), aff'd, 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).

### Commercial Activity

■ Plaintiffs assert, and defendants dispute, that the Chippewa commercially disposed of a substantial part of the fish and game they obtained by fishing and hunting during the treaty era. Plaintiffs assert they are free now commercially to dispose of fish and game they obtain by off-reservation fishing and hunting performed under the treaties. Specifically, they assert they may now trade and sell to non-Indians, in the modern manner, from their current harvests.

Their assertion is valid. The Chippewa were clearly engaged in commerce throughout the treaty era. Commercial activity was a major factor in Chippewa subsistence. Whether such commercial activity is now subject to state regulation is a question to be reached later in this case.

### Settlement

The parties presently agree to the specific geographical boundaries of the ceded territory. An initial presumption might well be that within the entire area marked by these boundaries plaintiffs may exercise today their usufructuary rights under the treaties. A massive possible exception to this presumption is the subject of a complex and major dispute between plaintiffs and defendants. This disagreement is in part a legacy of the proceedings in the course of the appeal to the court of appeals.

On the appeal in *LCO I* and prior to the entry of the court of appeals' initial opinion in that case, the defendants emphasized heavily in their briefs the "temporary" and "conditional" nature of the occupancy and usufructuary rights reserved by the plaintiffs in 1837 and 1842 (*See* e.g., defendants' brief filed August 16, 1982, at 12). But the context was not that some amorphous "settlement" by non-Indians would sloppily erase the plaintiffs' rights in a kind of willy-nilly demographic pattern of activity by individual, non-governmental non-Indians. On the contrary, defendants were contending that the power of the United States to remove the plaintiffs altogether from any or all of the ceded lands had been carefully preserved in the treaties. This removal power of the United States could be exercised only on certain conditions stated explicitly in the treaties. Defendants argued that the stated conditions had been satisfied, the removal had been ordered lawfully and formally by the President, and this was the end of the matter.

In their request for rehearing or clarification in *LCO I,* and in their appeal in *LCO II,* defendants modified but persisted in this general approach. They contended that the exercise of plaintiffs' reserved usufructuary rights had been terminated by a lawful and formal series of actions by the United States, namely, the issuance of land patents to private parties. It was not argued that private, individual non-Indians had terminated plaintiffs' rights simply by deciding to settle in the ceded lands. Rath-

er, it was the United States government which had defined the "settlement" by issuing the formal patent to this or that parcel. It is to be noted that unlike removal orders, this type of formal United States action—issuing patents—is not referred to in the 1837 and 1842 treaties.

At these stages in *LCO I* and in *LCO II*, and even prior to the entry of the court of appeals' first opinion in *LCO I*, plaintiffs addressed the issue in briefs to the court of appeals. They spontaneously conceded that:

> [u]sufructuary rights could not be exercised on settled land where the exercise of the right would be inconsistent with occupancy of the land by whites. In such cases, the usufructuary right must give way to the rights of the landowner. Usufructuary rights generally do not involve the right to trespass on private lands in exercise of the right.... The usufructuary right may be exercised only on public waters and on lands where hunting and other usufructuary activities generally are permitted.

Combined Responsive/Reply Brief at 34–35 (citation omitted). These statements were proffered by defendants as providing a practical solution to a difficult clash of competing interests and demands. Plaintiffs did not quite concede that conduct by an aggregate of individual, non-governmental non-Indians should be held sufficient to have effected *pro tanto* diminution in the Chippewa's exercise of their reserved rights. Nor did they suggest that this practical solution reflected the Chippewa's contemporaneous understanding of the 1837 and 1842 treaties.

In *LCO I*, the court of appeals proceeded, without more, to pronounce that the exercise of plaintiffs' usufructuary rights is "limited to those portions of the ceded lands that are not privately owned." 700 F.2d at 365. The court found that the Chippewa's understanding at treaty time was that their rights "could be limited if the land were needed for white settlement...." *Id.* at 365 n. 14. In *LCO II*, the court attempted to clarify these specific

words. It stated that "settlement" by non-Indians is synonymous with "private ownership." 760 F.2d at 181–82. The parties agree that this court must now define "private ownership" and settlement, as the court of appeals intended to use the terms, in order to give life to the court of appeals' decision that a portion of plaintiffs' usufructurary rights have been terminated as a result of white settlement.

At oral argument in this court, on remand, I asked the parties to consider my proposal that I disregard, at least temporarily, any of the court of appeals' discussion of settlement and private ownership. In an order dated April 17, 1986, I proposed that I would proceed to decide the case as if the court of appeals had been silent after entering its opinion and order of January 25, 1983; that is, as if there had been no reconsideration of *LCO I* and no *LCO II*. I proposed, however, that I then go on to consider what effect, if any, I am obliged to give or should give, as a matter of discretion, to the language of the court of appeals in *LCO I* and *LCO II* on the subject of settlement and private ownership, and, if necessary, to modify what would otherwise be my decision.

Both parties' written responses to my proposal have asserted I am bound by the court of appeals' statements, just quoted, that the Chippewa understood that their exercise of usufructuary rights could by limited if the land were needed for white settlement, and that their right to exercise their treaty-based usufructuary rights has been limited to lands not privately owned.

Apparently, counsel for plaintiffs supposed there were fears on the part of the court of appeals of the practical consequences of a possible decision that the rights reserved in 1837 and 1842 remain in force and were not extinguished in 1850 and 1854. Apparently, it was in an effort to allay such fears that plaintiffs' counsel assured the court of appeals that plaintiffs do not claim that the reserved rights may be exercised today throughout the ceded territory. Presently in this court, apparently for strategic reasons, they cling to

the language of the court of appeals in the remarks it added to its opinion in *LCO I* and to its language in *LCO II*, as a sort of unshakable floor below which their rights cannot be reduced. However, they attempt no explanation of why the court of appeals found that the Chippewa understood in 1837 and 1842 that their reserved rights could be diminished if the ceded lands were needed for non-Indian settlement.

On the other hand, defendants cling to the remarks the court of appeals added to its opinion in *LCO I* and to its remarks in *LCO II*, as a kind of unshakable ceiling above which the Chippewa's rights cannot now be raised by this court. However, they have made bold to seek the opportunity in this court, on remand, to provide evidence that the Chippewa understood their reserved rights would automatically be diminished by amorphous non-Indian "settlement" to a degree even greater than the court of appeals found the Chippewa to have understood to be possible.

The result of all this is most unsatisfactory, in my view. I respect the court of appeals' role and appreciate the difficulty it encountered in this case. However, this district court had never engaged in fact-finding as to the Chippewa's understanding of whether their treaty-reserved rights could be limited to an area less complete than the area coinciding with the boundaries of the ceded lands. This court held the rights were extinguished by the 1854 treaty; there was no occasion for me to explore the question of their vulnerability to subsequent diminution. But as a kind of postscript to its opinion in *LCO I*, and then again, summarily, in *LCO II*, the court of appeals proceeded to engage in fact-finding that the Chippewa entertained in 1837 and 1842 a certain understanding on the effect of subsequent "white settlement."

■ Free of any direction by the court of appeals on the point, I would find that in 1837 and 1842 the Chippewa did not understand that their reserved usufructuary rights could be diminished or eliminated lawfully under those treaties unless a removal was properly ordered. In my actual findings, above, I have limited this proposition in an effort to be obedient to the court of appeals, but without excessive violence to the factual record. I have found, and now repeat, that the Chippewa understanding in 1837 and 1842 was that in the absence of a lawful removal order or in the absence of fresh agreement on their part, settlement and private ownership of parcels by non-Indians would not require the Chippewa to forego anywhere or in any degree exercise of their reserved usufructuary rights necessary to assure that, when the exercise of those rights was combined with trading with non-Indians, the Chippewa would enjoy a moderate living within the entire ceded territory.

■ The effect is this: On lands privately owned, the Chippewa have lost their reserved usufructuary rights. However, if at a given time the Chippewa can show, in a lawsuit if necessary, that this diminution in their usufructuary rights is preventing them from enjoying a modest living, appropriate measures must be taken for Chippewa activity on privately owned lands to permit the Chippewa to enjoy a modest living.

■ A specific definition of privately owned lands was not articulated by the court of appeals in *LCO I* and *LCO II*. I declare the term to mean lands that are privately owned as of the time Chippewa exercise of usufructuary rights is contemplated or carried on. The lands are not "privately owned" if they were privately owned at some earlier time, but are no longer so owned. Also, if the owners of privately owned lands have made provision for hunting, fishing, and gathering by the public generally—rather than for such activity only by limited persons or groups specifically designated by the owners—the Chippewa can exercise their usufructuary rights on those lands.

The question looms whether, by reason of non-Indian settlement, the Chippewa have lost their reserved usufructuary rights on public lands, as well as on privately owned lands, at least to the extent

that the exercise of those rights is incompatible with the uses to which public land is being put, such as for schools and hospitals. No language of the court of appeals in its addition to *LCO I* or in *LCO II* compels such a holding, and I make none. Although the parties listed this as an issue to be addressed in phase I of this case, they did not present or develop arguments as to why such incompatibility should limit the Chippewa, rather than the non-Indians, in competing uses of public lands, nor did they undertake to catalog the instances in which the uses would be inconsistent. I note the difficulty and significance of the point, but do not address it, leaving it to phase II of the trial. It is possible, although I imply no opinion, that the regulatory power of the state of Wisconsin over the Chippewa's exercise of their reserved usufructuary rights, if it possesses such power, extends to safety problems arising from incompatible uses of public lands, as well as to conservation problems.

I add a comment to this section on the effect of non-Indian settlement upon the Chippewa's enjoyment of the usufructuary rights they reserved in the 1837 and 1842 treaties. I have made it as plain as I can that there is no evidence to support a finding that the Chippewa understood at treaty time those rights could be diminished—not by the negotiation and achievement of a new treaty and not by a lawful exercise of the president's removal power—but by some amorphous aggregate of sporadic non-governmental decisions by individuals to acquire private ownership of parcels of the ceded territory, or by unilateral choices by the state of Wisconsin and local units of government from time to time, to put parcels of public land to some public use incompatible with the Chippewa's continued exercise of their usufructuary rights. To construe the treaties as embodying some such potential for *de facto* diminution in response to non-Indian settlement is totally at odds with the rule that these treaties must be construed consistently with the Chippewa's understanding of their meaning.

I do not ignore the obvious practical dilemma present in the ceded lands as of 1987. But that dilemma should be responded to by an effort to negotiate a new treaty. If a new treaty is not sought or achieved, then Congress is the branch of the United States government which should address the problem. Whether justified or not, it is by now well-established that Congress enjoys the power to modify Indian treaties unilaterally. If the 1837 and 1842 treaties must be modified to resolve the practical dilemma, and I do not imply that they must, the modification should be accomplished forthrightly by a *tour de main* by the Congress, and not by the United States courts.

### Allocation

The plaintiffs seek a declaration of the legal basis for allocation of the resources encompassed within the treaty rights. They argue that the Chippewa are entitled to the natural resources in the ceded territory to the extent required to provide them with a livelihood or moderate living, and they cite *Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

The state argues that the treaties do not entitle the Chippewa to any permanent share of any resource in the ceded territory. They argue that the concept of allocation implies a permanent share of a resource, but that the Chippewa have no permanent rights under the treaties. The state maintains that the potential for allocation was eliminated in 1854 when the Chippewa returned to the bargaining table and arranged for their permanent well-being, in the form of reservations. Further, the state argues that when the Chippewa entered into the treaties of 1837 and 1842 they pondered the potential for scarce resources and the regulation of resources sometime in the future, but took a gamble that scarcity of resources would not become a problem. They chose instead to risk the consequences of being required to accommodate their use of resources to the use by white settlers.

Allocation has arisen in the Washington fishing rights cases in modern times in light of the scarcity of resources, such as steelhead and salmon, and because of the intense demand by Indians and non-Indians alike for those resources. In Washington, both Indians and non-Indians are involved extensively in commercial fishing. The modern fishing practices of non-Indians had the potential to harvest all of the steelhead and salmon before they ever reached the Indians' fishing grounds. In light of these circumstances, the court allocated between the Indians and non-Indians the harvestable share of the desired fish. The allocation was based on the specific language of the treaty between the Indians and the United States which stated, in part, that the Indians had the "right of taking fish, at all usual and accustomed grounds and stations . . . in common with all citizens of the Territory." 443 U.S. at 662, 99 S.Ct. at 3062.

█ Neither the Chippewa nor the state of Wisconsin, I believe, suggests that a fixed share of any resource should be apportioned to the Chippewa, at least at this stage. Such an allocation is unwarranted at this time. Neither party has presented evidence that any particular species is endangered in the ceded territory. The Washington allocation cases differ from this case in significant respects: (1) no finding has been made here of scarcities of resources; (2) the language of the Chippewa treaties is different.

█ Although allocation of a fixed share of any resource in Wisconsin would be inappropriate at this time, it may be helpful to discuss the issue further. Neither the Chippewa nor the non-Indians contemplated in 1837 and 1842 that the natural resources in the ceded territory might someday be subject to governmental regulation. It is extremely unlikely anyone understood that state government would seek to regulate the environment as it does today. As of 1837 and 1842, the Chippewa had had experience with scarce resources over time, but neither they nor the non-Indians imagined that one day the natural resources might be apportioned to one group or another, or to several groups in certain shares. Because I find that the parties neither contemplated regulation or allocation, and because there has as yet been no showing that either is required by some reason extraneous to the treaties, I will not order any allocation at this time.

I conclude, however, that the Chippewa at treaty times did contemplate their subsistence and did understand that the usufructuary rights they reserved would be sufficient to provide them with a moderate living.

> [T]he central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood— that is to say, a moderate living.

*Fishing Vessel Ass'n*, 443 U.S. at 686, 99 S.Ct. at 3075.

### Regulation by the state of Wisconsin

█ Plaintiffs contend the state of Wisconsin has no authority to regulate their exercise of the usufructuary rights they reserved in the treaties of 1837 and 1842 with the United States. They contend the state is prevented from interference with that treaty relationship.

In *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) (*Puyallup I*) and *Washington Game Department v. Puyallup Tribe*, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) (*Puyallup II*), it was decided that the state of Washington could regulate the exercise of treaty-based usufructuary activities when reasonable and necessary for the purpose of conservation. I agree that both these decisions are somewhat unclear and that they have been the target of criticism. One point of criticism is their failure to explain the reason why the state may intrude for the particular purpose of conservation. Nevertheless, I consider myself bound by them and reject plaintiffs' efforts to distinguish them from the case at hand. The principle which un-

derlies *Puyallup I* and *Puyallup II* has been confirmed in *Antoine v. Washington*, 420 U.S. 194, 205, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975). I am not persuaded by *United States v. Dion*, 752 F.2d 1261 (8th Cir.1985) (en banc), *rev'd in part,* —— U.S. ——, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986) upon which plaintiffs rely, principally because the treaty right at issue in *Dion* was an exclusive on-reservation hunting right possessed by the Indians.

The extent of the state's regulatory power in the present case is to be determined in phase II of the trial. Also to be considered and decided then is whether the state enjoys a power to regulate for safety purposes plaintiffs' exercise of their usufructuary rights on public lands.

### Summary

My fact-finding for the purposes of phase I of the trial of this case is as it appears in the "Facts" section, *supra.* With respect to the various issues which are candidates for decision at this juncture in the litigation, my legal conclusions are set forth in the opinion above. They may be summarized as follows:

■ *Nature of the usufructuary rights.* These rights today include rights to all the forms of animal life, fish, vegetation, and so on, set forth in the facts section, and use of all of the methods of harvesting employed in treaty times and those developed since.

*Commercial activity.* The fruits of the exercise of their usufructuary rights may be traded and sold today to non-Indians, employing modern methods of distribution and sale.

*Settlement.* The usufructuary rights reserved by the Chippewa in 1837 and 1842 have been terminated as to all portions of the ceded territory which are privately owned as of the times of the contemplated or actual attempted exercise of those rights. However, appropriate arrangements for exercise of those rights on private lands must be made upon a showing by the Chippewa that, without such arrangements, they are unable to enjoy a modest living by the exercise of their usufructuary rights within the ceded territory.

*Allocation.* When, as, and if a need for allocation of resources is required, permanent right in the Chippewa must be recognized as to that quantity which will insure them a modest living.

*State Regulation.* The state enjoys the right to impose restrictions upon the Chippewa's exercise of the usufructuary rights, provided the restrictions are reasonable and necessary to conserve a particular resource. Whether state regulatory power extends to measures reasonable and necessary to the safety of all persons possibly affected by inconsistent uses of public lands, is an open question, to be addressed in phase II of the trial.