**LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDI-ANS; Red Cliff Band of Lake Superior Chippewa Indians; Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin; St. Croix Chippewa Indians of Wisconsin; Bad River Band of the Lake Superior Chippewa Indians; Lac Du Flambeau Band of Lake Superior Chippewa Indians, Plaintiffs,**

v.

**STATE OF WISCONSIN, Wisconsin Natural Resources Board, Carroll D. Besadny, James Huntoon, and George Meyer, Defendants.**

No. 74–C–313–C.

United States District Court, W.D. Wisconsin.

June 3, 1988.

Sarah Lewerenz, Hayward, Wis., James L. Beck, Wisconsin Judicare Inc., Wausau, Wis., for Lac Courte Oreilles Band of Lake Superior Chippewa Indians.

Milton Rosenberg, Madison, Wis., for Red Cliff Band of Lake Superior Chippewa Indians.

Deborah Krusche Bruck, Milwaukee, Wis., for Sokaogon Chippewa Indian Community, Mole Lake Band of Wis.

Howard Bichler, Webster, Wis., for St. Croix Chippewa Indians of Wis.

Candy L. Jackson, Odanah, Wis., for Bad River Band of the Lake Superior Chippewa Indians.

Kathryn Tierney, James Janetta, Lac du Flambeau, Wis., for Lac du Flambeau Band of Lake Superior Chippewa Indians.

Mary Bowman, Stephen J. Nicks, Asst. Attys. Gen., Madison, Wis., for defendants State of Wis., Wisconsin Natural Resources Bd., Carroll D. Besadny, James Huntoon, and George Meyer.

## OPINION AND ORDER

CRABB, Chief Judge.

A trial was held in this case in March 1988 to determine two issues: (1) the economic value of the "modest standard of living" guaranteed plaintiffs under their treaties with the United States; and (2) the income-generating potential of the available resources in the ceded territory of northern Wisconsin.[1]

---

1. The territory ceded to the United States by the plaintiffs in the treaties executed in 1837 and 1842 includes somewhat more than one-third of the land in the State of Wisconsin, most of it lying at or above the 45th parallel. *See* Appendix A to *United States v. Bouchard,* 464 F.Supp.

I conclude that plaintiffs have established the monetary measurement of a "modest standard of living" and have proven that they could not achieve this standard even if they were permitted to harvest every available resource in the ceded territory and even if they were capable of doing so. In other words, the modest living standard imposes no practical limit on the amount of the natural resources that can be harvested by tribal members.

Earlier decisions in the case have established certain principles that set the context in which the March trial was held. In very brief form, they include the following.

Plaintiffs hold usufructuary rights, that is, the rights to hunt, gather, and fish, on the lands they ceded to the United States in treaties signed in 1837 and 1842. *Lac Courte Oreilles Band of Chippewa Indians v. Voigt*, 700 F.2d 341 (7th Cir.), *cert. denied*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed. 2d 72 (1983) (*LCO I*). Plaintiffs may exercise their usufructuary rights throughout the ceded territory, except on those portions that are privately owned as of the times of the contemplated or actual attempted exercise of the rights. *LCO I*, 700 F.2d at 365 n. 14; *Lac Courte Oreilles Band of Chippewa Indians v. State of Wisconsin*, 653 F.Supp. 1420, 1435 (W.D. Wis.1987) (*LCO III*). Plaintiffs' usufructuary rights include the right to harvest all of the more than 175 species of animals and plants set forth at pages 1426–1427 in *LCO III*, 653 F.Supp. 1420, and the right to use all of the harvest methods employed in treaty times and developed since then. *Id.* at 1435. Plaintiffs enjoy greater rights to hunt, fish, and gather in the ceded territory than do non-Indians; plaintiffs' rights are paramount. *Id.* at 1429; *see also* Defendants' Opening Statement, trial transcript, Vol. I, p. 19. Plaintiffs have the right to harvest within the ceded territory so much of the natural resources as is necessary to provide them with a modest standard of living. *LCO III*, 653 F.Supp. at 1434, 1435.

Most of these decisions were made in the first or declaratory phase of this extended litigation determining the nature, scope, and extent of plaintiffs' usufructuary rights. The case is now in its second or regulatory phase, in which the issue to be determined is the permissible bounds of state regulation of plaintiffs' usufructuary rights. This phase is proceeding in stages. The March trial was the first of those stages. The second will be a determination of those state hunting and fishing regulations to which plaintiffs will be subject; the third will be a determination whether the plaintiffs or the state will be responsible for the enforcement of those regulations with respect to plaintiffs.

The first stage of this phase of the case has focused on the quantification of the concept of "modest standard of living" in large part because of defendants' desire to have a determination of at least the outer limits of plaintiffs' harvesting rights. Defendants have sought repeatedly, but without success, to have the court make an allocation of the available resources in the ceded territory, that is, determine the permanent share of each resource to be allocated between plaintiffs and the non-Indian users of the resource. Defendants have been rebuffed, not because they have failed to make a convincing showing of their need for certainty as to the extent of plaintiffs' right to the resources in undertaking long-range planning for the management of the resources, but because they have been unable to show a legal basis for a court-imposed division of the resources.

Although it was defendants that sought a delineation of plaintiffs' harvesting rights, I assigned plaintiffs the burden of proof at trial on the issues of the quantification of the modest living standard and the income-generating potential of the resources. At the trial, plaintiffs relied on only one witness: Ronald Cummings, a professor of economics at the University of New Mexico. Defendants called no witnesses, but chose to confine their defense to a challenge to the sufficiency of plaintiffs' evidence.

I have summarized Cummings' testimony at some length as background for the findings of fact that will follow.

## TESTIMONY OF RONALD CUMMINGS

Professor Cummings testified that he has had experience in the valuation of natural and environmental systems. He has never engaged in a valuation of the kind he undertook for this trial in which he was asked by plaintiffs to consider and provide estimates for a modest standard of living, to estimate the income needs of the tribes that would be required to bring them to a modest standard of living, and to measure the income-generating potential of the resources in the ceded territory.

Because modest standard of living is not a term of fixed meaning in economics, Cummings began his assignment by reading the decision in *LCO III*, in which Judge Doyle found as fact that in treaty times the Chippewa had no interest in the accumulation of wealth.[2] From this, Cummings concluded that the contemporary level of income that would comport with what the Chippewa had in treaty times was one that allowed the purchase of the necessities of life but did not allow for the accumulation of wealth. He reviewed Department of Commerce Consumer Expenditures Studies showing average annual income and expenditures of urban consumer units and found a level of income at which an average urban consumer unit could have made the average expenditures for its income level without having any excess for savings. Cummings determined that this income level, which he called a "zero savings level of income," best fit Judge Doyle's characterization of a modest standard of living.

This income level is considerably below the average income of households in the Midwest and in the United States. It does not allow for any savings for retirement, education, or illness, whether in the form of investments, savings accounts, or the purchase of insurance. Moreover, it is based upon an average 2.67 persons in a household unit, whereas the average Chippewa household both on and off the reservations is significantly larger than 2.67 persons. For example, the average household on the Red Cliff reservation includes 4.06 persons, and the smallest average households, on the Sakaogon reservation, have 3.43 persons. Information from the 1980 United States Census indicates that the average size of all American Indian households in Wisconsin is 3.44 persons.

In 1984, the level of income that would have enabled the average urban consumer unit in the United States to make basic expenditures without achieving any savings was $18,981 per household. In 1986, the amount would have been $20,036, adjusted according to the Consumer Price Index.

The number of "consumer units," or households, on the plaintiffs' reservations is approximately 1,457. The number of off-reservation households is approximately 2,620. The amount of money necessary to provide plaintiffs with a zero savings level of income is $82,000,000 (the product of 4,077 households times $20,036).[3] The amount of money needed to bring the plaintiffs from their estimated actual income level to a modest income level is $22,500,000 ($82,000,000 less estimated income levels based on 1980 census data for urban American Indian, Eskimo and Aleut households in the State of Wisconsin, adjusted to 1986 figures using the Consumer Price Index.)

2. Judge Doyle found that:

> [In treaty times], [t]he Chippewa relied on hunting and gathering for their subsistence.[2] They harvested resources for their own immediate, personal use and for use as trade goods in commerce. The Chippewa traded goods for items which contributed to their subsistence. Neither in harvesting resources for commercial purposes nor in harvesting resources for their own use did the Chippewa strive for more than a moderate, satisfactory living. They were indifferent to acquiring wealth beyond their immediate needs.

[2] For purposes of this opinion, "subsistence" is defined as the means of subsisting, or what is necessary to support life, including food, clothing and shelter. Materials used for religious purposes are included. *LCO III*, 653 F.Supp. at 1424.

3. Although Chippewa households tend to be larger than the household units used by the Department of Commerce, plaintiffs are not contending that the income level chosen by Cummings should be adjusted to reflect their larger households.

In calculating the income-generating potential of the resources in the ceded territory, Cummings divided the resource into the following categories: deer, bear, small game, and waterfowl, fishing rights, timber, and other plant resources, including wild rice. For the animal and wild rice resources, he used figures for the potential harvest provided him by the wildlife biologists at the Great Lakes Indian Fish and Wildlife Commission, and stipulated to by defendants, with the "potential harvest" being the maximum of that portion of the particular resource that can be taken using the best management practices for that resource. For the timber resources, Cummings used county and state forest timber sales data from the Wisconsin Department of Natural Resources.

Cummings computed the potential annual harvest of deer on public lands in the ceded territory by taking 48.4 percent (the proportion of hunters who hunt on public lands) of the total number of deer harvested in the area. Cummings made the assumption that the deer harvest would be proportional to the number of hunters rather than to the proportion of public to private lands in the ceded territory. Applying 48.4 percent to the total harvest, and adding .0191 deer for every acre of land enrolled in the state's forest cropland program, he estimated a potential harvest of 73,052.[4] He did not include federally-owned lands in his estimate.

If each member of the plaintiff tribes used deer meat to supply the 153 pounds of red meat the average person in the United States consumes annually, it would be necessary to harvest 37,309 deer. The retail value of this meat would be $2,300,000. (37,309 deer, each with a dressed weight of 60 pounds and a retail price equal to that of beef cattle, $2.00 a pound, yield approximately $4,600,000.)[5] If tribal members harvested, dressed, and sold the remaining

available deer, they could earn approximately $1,200,000. (35,743 deer with an average dressed weight of 60 pounds and a wholesale price of $1.00 a pound, would yield approximately $2,100,000.) Valued conservatively, the available deer in the ceded territory could yield $5,700,000.

The number of bear available for harvest on public lands in the ceded territory is 243. The commercial value of the bear harvest at wholesale prices is only a few thousand dollars.

The potential harvest of small game on public lands in the ceded territory is 1,605,947, computed by applying a percentage of 52 (proportion of hunters on public lands) to the harvest estimates for the whole area provided by the Great Lakes Fish and Wildlife Commission.

The commercial value of small game is $300,000 (using an average one pound of dressed weight at a wholesale price of $.15, the price per pound of non-broiler chickens; if a wholesale price of $.30 is used, the price per pound of broiler chickens, the value is $600,000).

The potential harvest of waterfowl on public lands in the ceded territory is 13,223. The value of waterfowl to the plaintiffs as a substitute for the purchase of poultry at stores is $40,000 (at a dressed weight of one pound at a retail price of $.30, the retail price of non-broiler chickens, or $80,000 at a retail price of $.61 per pound, the retail price of broiler chickens).

The potential harvest of commercially valuable fish from inland lakes and rivers in the ceded territory could yield $1,800,000. Other fish and shellfish could be used to satisfy the plaintiffs' needs for fish, in which case their retail value would be $900,000 (computed by taking the value of the amount of fish and shellfish consumed per capita in the United States, $62.26,

---

4. The Department of the Interior and Department of Commerce table used by Cummings (plaintiffs' exhibit no. 121) does not indicate whether the privately-owned lands enrolled in the forest cropland program are included in the category of "public lands." Cummings assumed they were not.

5. Prior to trial, Cummings had used prices of $1.00 and $.55 for the retail and wholesale prices of deer. He acknowledged at trial that these prices were based on live weight rather than dressed weight, and that the higher prices were equally valid.

times 14,621 enrolled members of the plaintiff tribes).

The average annual revenue from the sale of timber from state and county forests in the ceded territory is $3,100,000.

The potential harvest of wild rice could yield $320,000 (80,000 pounds of harvestable rice, valued at the wholesale price of $4.00 per pound of processed rice).

If the harvestable fruits, berries, and nuts in the ceded territories were used to replace fresh vegetables, fruits, and nonprescription drugs that plaintiffs would otherwise purchase, the value of these plant resources would be approximately $1,600,000.

The total income-generating potential of the harvestable resources, including timber, in the ceded territory is no more than $18,000,000.

Cummings used only the market approach in valuing the resources. He did not use a contingent valuation analysis or compute any value-added income. He did not take into consideration any income-producing potential for hunting and fishing related activities, such as hotels, motels, or resorts, or hunting and fishing equipment production. He found no evidence that plaintiffs have any present capacity for generating income from such sources. He did not calculate the value of licensing the off-reservation hunting and fishing rights. He assumed that those rights are personal to plaintiffs and cannot be assigned. In making his calculations, Cummings did not value the plaintiffs' present or future income from fishing in Lake Superior, from the natural resources on their own reservations, or from the sale of timber harvested from federally-owned lands. He made no allowance for any costs associated with the harvesting or marketing of any of the resources.

## FINDINGS OF FACT

The modest standard of living guaranteed to plaintiffs under the 1837 and 1842 treaties may be quantified as a zero savings level of income. In 1986 that level of income was $20,036 for the average household unit in the United States. To provide plaintiffs the equivalent of a modest standard of living for the households of tribal members would require approximately $82,000,000. Assuming, as I do, that the households that make up the plaintiff tribes have the average incomes of other American Indian, Eskimo, and Aleut households in Wisconsin, it would take $22,500,000 in revenues from the harvest of natural resources to bring their household incomes to the guaranteed level. Under the most optimal conditions, capture of the entire potential harvest of the ceded territory could produce no more than $18,000,000 in foods, pelts, and timber for personal consumption and sale.

Plaintiffs' right to a modest standard of living cannot be met at the present time by harvesting all of the available resources in the ceded territory.

## OPINION

Defendants have challenged Professor Cummings' testimony on many grounds. They argue the absence of a scientific basis for his determination of a modest standard of living and for his valuation of the natural resources. They point to numerous instances in his testimony in which he reevaluated his estimates of income-generating potential and they contend that these demonstrate the invalidity of his approach as well as his methods. At the same time, however, defendants have no proof that Cummings is not correct in his ultimate conclusion that the plaintiffs' guaranteed standard of living cannot be met by a harvest of all the available resources in the ceded territory. They produced no expert to testify that some portion of the harvest less than the whole could generate enough income to give plaintiffs the equivalent of what they were guaranteed under the 1837 and 1842 treaties. Their position is that income-generating capacity of the natural resources or the modern equivalent of a modest standard of living are concepts that are not susceptible of measurement, but they produced no evidence in support of that position.

It is true, as defendants point out, that Cummings' estimate of the total value of the available natural resource harvest is nothing more than a gross estimate. Cummings never suggested that it was otherwise, and certainly never suggested that it was a precise analysis of the market value of any particular resource. What he did maintain was that the figures he used were weighted so heavily in favor of defendants in the first place that any modifications of the figures in the course of cross-examination could have no real effect upon his ultimate conclusions. In other words, if one starts with the proposition that every harvestable deer in the ceded territory could be captured, that the capture would cost nothing in the way of transportation, equipment, or ammunition, that every deer would be suitable either for home consumption or for commercial use, and that it would cost nothing to process and market the deer, one has already built into the estimate so much excess value as to make essentially meaningless any difference of opinion over dressed weight and live weight prices of the deer or how many additional deer might be harvested in the federally-owned forests in the ceded territory.

Defendants attacked Cummings' failure to factor into his computation of the average household income of tribal members the income from plaintiffs' Lake Superior fishing rights. Cummings' determination of household income did not rest on a computation of actual income; it was based upon census figures showing *average* household incomes of Indians on the reservations and elsewhere in the state. Use of average household incomes incorporates income from all sources, including any harvesting. Because the figures date from 1980, they may not reflect the full extent of plaintiffs' exploitation of their Lake Superior fishing rights; on the other hand, the figures include government welfare benefits that would disappear, presumably, if plaintiffs were to earn large amounts of income from other sources.

In cross-examining Cummings, defendants' counsel implied that he should have considered a subjective, or psychic, component in quantifying the modest standard of living identified in Judge Doyle's opinion; alternatively, he should have realized that it is not possible to quantify such a standard of living because of its subjective and unmeasurable component. Defendants seem to be suggesting either that, in giving economic value to the concept of a modest standard of living, an economist must include the value to the plaintiffs of their opportunity to engage in their traditional means of earning a living in the same area in which their ancestors hunted, fished, and gathered, or, that a concept of moderate living is one that cannot be quantified because it was intended to describe the tribes' way of life in treaty times, rather than a particular income level.

Defendants did not pursue these points, and as I have noted, they did not produce any expert to testify to the validity of either of their suggestions. I am not persuaded that they have any inherent force. Nothing in Judge Doyle's 1987 opinion suggests that the modest standard of living cannot be given an economic value, or that it must be reduced by some amount of money that represents the "satisfaction" derived by tribal members in earning their living as they did in treaty times.

In summary, I find Cummings' testimony on the subjects of modest standard of living and the income-generating potential of the resources persuasive and credible. I am persuaded the approach he adopted on these issues of first impression was reasoned and valid, in light of the nature of the task and the kind of information available to him. His conclusions bore up under cross-examination.

In addition to challenging Cummings' approach and the credibility of his testimony, defendants have renewed their contention that the court should consider an allocation of the resources. Defendants argue that such an allocation of the rights to the natural resources is anticipated by the holding in *United States v. Bouchard,* 464 F.Supp. 1316, 1338 (W.D.Wis.1978), *rev'd on other grds. sub nom., LCO III,* 700 F.2d 341, that the Indians do not hold the exclusive rights to hunt and fish in the ceded lands; rather

they hold those rights "in common with white persons in the area." They argue that this is the "law of the case"; that it was not reversed by the court of appeals in *LCO III;* and that it militates against a finding that the plaintiffs could ever have an economic claim upon all of the resources. Defendants contend also that applicable law dictates the placement of a ceiling of 50 percent on the plaintiffs' rights to the available harvest, and they cite *Washington v. Fishing Vessel Ass'n,* 443 U.S. 658, 686–687, 99 S.Ct. 3055, 3075, 61 L.Ed.2d 823 (1979), for the proposition that the right of Indians to fish or hunt "in common" with non–Indians mandates a 50–50 allocation of the resources.

Defendants try to draw too much from the holding in *Fishing Vessel.* The case does not establish a rule of law that Indian and non–Indian rights are subject to a 50–50 allocation in every situation in which the two groups hold rights "in common." It establishes only that such a division was proper in the State of Washington with respect to one species of fish, in one river, where it had been shown that allocation was necessary both to protect the species *and* to protect the Indians' right to harvest the species, and the applicable treaty provided explicitly that the rights of the Indians and non–Indians were held in common.

The circumstances present in the State of Washington are not present in this case in Wisconsin. As defendants concede, the treaties applicable to plaintiffs are silent as to whether the Chippewa use of the natural resources is exclusive or in common. In this case, defendants are unable to show that present harvesting by plaintiffs is endangering the species, or that they cannot protect plaintiffs' right to harvest. Moreover, the treaty-protected rights at issue here extend to far more than one species and the contested harvesting area is not limited to one river.

Defendants are correct in arguing that Judge Doyle held in *Bouchard* that the Chippewa do not hold exclusive rights to harvest in the ceded territory. However, the decision entered today does not conflict with that holding. Plaintiffs have not shown that they are capable of harvesting all of the available harvest. The determination that their income needs cannot be met by all of the harvest does not give them exclusive rights to hunt, fish, or gather in the ceded territory.

Although defendants have raised the issue of allocation at least two times before without convincing this court of the rightness of their position, I understand their reasons for continuing to press it. With the responsibilities they have for management of the complex interplay between natural resources and users of the resources, defendants have the strongest possible interest in reducing the uncertainties of their task. It would be far easier for defendants to carry out their responsibilities if the Indian share of the resource were to be determined in a specific and permanent amount. I am sympathetic to the difficulties they face when the issue remains unresolved. However, I must reiterate that the legal basis for a permanent allocation of the resources has not yet been shown.

I do not intend to determine in this opinion the practical measurement of plaintiffs' share of the harvest. Plaintiffs' counsel have suggested that at least for this year and for the near future, the practical limit on that share will be plaintiffs' harvesting capabilities, subject of course to considerations of the preservation of the species.

I realize the burdens such a fluid "limit" places upon the defendants. I remind them and all others who are interested in this litigation, however, of Judge Doyle's statement in *LCO III:*

I do not ignore the obvious practical dilemma present in the ceded lands as of 1987. But that dilemma should be responded to by an effort to negotiate a new treaty. If a new treaty is not sought or achieved, then Congress is the branch of the United States government which should address the problem. Whether justified or not, it is by now well established that Congress enjoys the power to modify Indian treaties unilaterally. If the 1837 and 1842 treaties must be modified to resolve the practical dilemma, and I do not imply that they

must, the modification should be accomplished forthrightly by a *tour de main* by the Congress and not by the United States courts.

## SUMMARY

The only purpose of the March trial was to determine whether the monetary value of a modest standard of living could be quantified and related to the income-generating potential of the natural resources in the ceded territory. That determination has been made. Plaintiffs have shown that their modest living needs cannot be met from the present available harvest even if they were physically capable of harvesting, processing, and gathering it. The standard of a modest living does not provide a practical way to determine the plaintiffs' share of the harvest potential.

It was not the purpose of the trial to determine the extent of plaintiffs' permanent right to any or all of the resources in the ceded territory. That issue may arise in the future, "when, as and if a need for allocation of the resources is required." *LCO III*, 653 F.Supp. at 1435. It is not the issue raised and determined at this stage of the regulatory phase of the trial.