758 F.Supp. 1262 (1991)
LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; Red Cliff Band of Lake Superior Chippewa Indians; Sokaogon Chippewa Indian Community; Mole Lake Band of Wisconsin; St. Croix Chippewa Indians of Wisconsin; Bad River Band of the Lake Superior Chippewa Indians; Lac Du Flambeau Band of Lake Superior Chippewa Indians, Plaintiffs,
v.
STATE OF WISCONSIN, Wisconsin Natural Resources Board, Carroll D. Besadny, James Huntoon, and George Meyer, Defendants,
and
Ashland County, Burnett County, Florence County, Langlade County, Lincoln County, Marinette County, Washburn County, and the Wisconsin County Forests Association, Inc., Intervening Defendants.
No. 74-C-313-C.
United States District Court, W.D. Wisconsin.
February 21, 1991.
*1263 Tracey Schwalbe, Atty., Hayward, Wis., for Lac Courte Oreilles.
Howard Bichler, St. Croix Tribal Council, Hertel, Wis., for St. Croix Chippewa Indians.
Joseph L. Young, Tribal Atty., Lac Du Flambeau Band, Lac Du Flambeau, Wis., for Lac Du Flambeau Band.
Earl Charlton, Milwaukee, for Mole Lake Band.
Milton Rosenberg, Madison, Wis., for Red Cliff Band.
David J. Siegler, Atty., Odanah, Wis., for Bad River Band.
James L. Beck, Wisconsin Judiciare Inc., Wausau, Wis., for Wisconsin Judicare Inc.
P. Scott Hassett, Atty., Madison, Wis., for Amicus Plaintiff.
Thomas L. Dosch and Philip Peterson, Asst. Attys. Gen., Madison, Wis., for State of Wis.

OPINION AND ORDER
CRABB, Chief Judge.
This seventeen year old Chippewa treaty rights case is before the court following a lengthy court trial on the extent to which the state and counties can regulate Indian harvesting of commercial timber. The regulation of timber harvesting has turned out to be the last subphase of the last phase of the litigation. Originally, three phases were contemplated. The first phase, the declaratory phase, would determine the activities the tribes were engaged in at the time of the treaties, their present day usufructuary rights and whether there is any basis for any state regulations of those rights. The second, or regulatory, phase would focus on the extent to which the state could regulate any aspect of plaintiffs' exercise of their treaty rights, and the third phase would determine the monetary damages, if any, to be awarded to plaintiffs for defendants' denial of the treaty rights over the period from the execution of the treaties to date.
Recent changes in the interpretation of the law relating to abrogation of the states' sovereign immunity under the Eleventh Amendment has shortened the litigation by foreclosing plaintiffs' claim for monetary damages against the State of Wisconsin and the individual defendants, who were sued in their official capacities. See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin (LCO-Immunity), 749 F.Supp. 913 (W.D. Wis.1990). In addition, since the timber trial was held, the parties have reached agreement on all but one of the remaining regulatory issues: the state's authority to enforce its civil boating laws against tribal members exercising their usufructuary treaty rights. Even on this issue, the parties were able to stipulate to all of the material facts, eliminating the need for a trial and making the timber trial the last one of the regulatory phase of the litigation. (An order on the enforceability of the boating regulations is being issued simultaneously with this opinion.)
This leaves for resolution only the issues related to the tribes' harvest of the timber resource. These raise a number of difficult questions. In large measure, this is a consequence of the differences between the timber resource and the other natural resources considered during this phase of the *1264 litigation. As became apparent during the trial of this subphase, timber is unique in the part it played in the original treaties, in its management, and in its very existence.
Because a large portion of the timber resource in the ceded territory is county-owned, seven individual counties and the Wisconsin County Forests Association, Inc., were allowed to intervene in this last subphase of the litigation. They have filed a motion for relief from that portion of the intervention order that barred them from relitigating any previously decided issue in the case. They ask to be allowed to file a motion to dismiss plaintiffs' claim to harvest rights in the timber resource pursuant to Fed.R.Civ.P. 12(b) and 12(h)(2) or, in the alternative, for leave to contest the treaty rights defined in Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin (LCO III), 653 F.Supp. 1420 (W.D.Wis.1987); Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin (LCO IV), 668 F.Supp. 1233 (W.D.Wis.1987); Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin (LCO V), 686 F.Supp. 226 (W.D.Wis.1988); and the unpublished order entered in this case on May 27, 1988, holding that plaintiffs have the right to harvest timber for commercial purposes. The intervenors' motions are now before the court, as are the merits of the regulatory issues that were the subject of the timber trial, and the state defendants' motion to dismiss plaintiffs' claim of a usufructuary right in commercial timber, or in the alternative, for partial summary judgment on this claim.
The initial question is the most basic: whether the usufructuary rights plaintiffs reserved under the treaties of 1837 and 1842 include the right to harvest the commercial timber resource in the ceded territory. Defendants contend that they do not. They urge the court either to grant the motion to dismiss this last claim of the plaintiffs or to vacate the order of May 27, 1988 denying defendants' motion for partial summary judgment, and grant them summary judgment on this claim. Plaintiffs argue that defendants' motion to dismiss plaintiffs' commercial timber claim is improper and untimely and that the May 1988 order should stand. They oppose the intervenors' motion for relief from the order of September 28, 1989 prohibiting relitigation of previously decided issues.
I begin with a discussion of the procedural issues. In 1988, the state defendants moved for partial summary judgment on the scope of plaintiffs' right to harvest timber from non-reservation lands in the ceded territory. The motion was directed to LCO III, 653 F.Supp. 1420, the last opinion entered in this case by the late Judge James E. Doyle. Defendants argued that the opinion should not be read as recognizing a right in the plaintiffs to harvest timber commercially. I construed defendants' motion as one to set aside a judgment or order pursuant to Fed.R.Civ.P. 60(b) and denied it on the ground that defendants had not established excusable neglect for failing to raise the issue before Judge Doyle.
As defendants point out, it was error to characterize the motion as one brought pursuant to Rule 60(b) because Judge Doyle's order was not a final judgment. Rather, it is the "law of the case," which means that it is not open to reconsideration except in unusual circumstances, and then only if the court chooses to exercise its discretion to revisit it. The law of the case doctrine "protects the ability of the court to build to its final judgment by cumulative rulings, with reconsideration or review postponed until after the judgment is entered." 1B Moore's Federal Practice, par. 0.404[4.-2] at 126 (2d Ed.)
Recently, I revisited Judge Doyle's 1984 ruling on the state's Eleventh Amendment immunity from an award of damages in this case because United States Supreme Court rulings in the intervening six years had changed the law on which that ruling had been based. LCO-Immunity, 749 F.Supp. 913. There have been no intervening rulings by any higher courts that pertain to plaintiffs' timber harvesting rights. Nevertheless, defendants maintain that Judge Doyle's opinion should be reviewed once again to determine whether he intended *1265 to recognize a right in plaintiffs to harvest timber commercially. Defendants assert that they have never had a chance to argue this issue because plaintiffs adduced no admissible evidence on commercial timbering at the Phase I trial. According to defendants, plaintiffs never asserted a right to harvest timber commercially until plaintiff Lac du Flambeau filed answers to defendants' Fourth Set of Interrogatories in February 1988, more than two years after the trial in the declaratory phase and ten months after entry of Judge Doyle's opinion. Defendants contend they had no reason to anticipate that Judge Doyle would rule that the various species of trees in the ceded territory were resources to be exploited commercially by the tribes, LCO III, 653 F.Supp. at 1427, 1435, or that I would read his ruling as encompassing a right to log the commercial timber resource. Plaintiffs dispute defendants' contention that these rulings came as a surprise to them.
Whether or not defendants should have anticipated that plaintiffs' treaty harvesting claims would extend to the commercial timber resource, as I held in the May 1988 order they should have, I am convinced now that the evidence adduced at the timber trial tips the balance in favor of reopening the issue of plaintiffs' right to harvest timber commercially. That evidence revealed the significant distinction between commercial logging and the use of different species of trees for particularized purposes. Whether plaintiffs' use of tree resources at treaty time entitles them to a commercial timber harvest is an important one that neither Judge Doyle nor I have addressed explicitly, and it is one that should be discussed in order to complete the record.
Because the matter has gone to trial (over the objections of the state defendants and the intervenors), I will treat defendants' motion as one for reconsideration of the May 1988 order denying their motion for clarification of LCO III, 653 F.Supp. 1420, rather than as a motion to dismiss or for summary judgment. Also, because defendants' motion raises the same issues as those raised by the intervenors in their motion for relief from the order of September 28, 1989, I will not discuss the intervenors' motion separately. I will use "defendants" hereafter to refer to both the state defendants and the county intervenors wherever they are not identified separately.
For the reasons that follow, I find and conclude that the usufructuary rights reserved to plaintiffs under the treaties of 1837 and 1842 do not include the right to harvest the commercial timber resource. When the Chippewa entered into those treaties they ceded to the United States their rights to the pine timber forever. It is a closer question whether plaintiffs understood that they were selling their rights to all the other timber as well. Whether they did understand this or not, they never contemplated retaining a usufructuary right to harvest timber commercially within the ceded territory because harvesting and selling timber were not among plaintiffs' usual and customary activities at the time the treaties were signed.
The conclusion that plaintiffs' reserved usufructuary rights do not include the right to harvest commercial timber makes it unnecessary to address the extent to which the state and counties may regulate plaintiffs' usufructuary rights in this respect. However, I will address the validity of the proposed regulations that relate to plaintiffs' gathering of miscellaneous forest products, which defendants concede is part of plaintiffs' treaty-protected harvesting rights.
From the evidence adduced at trial, I make the following findings of fact material to the determination of defendants' motion for reconsideration and of the extent to which defendants may regulate plaintiffs' usufructuary right to gather forest products.

FACTS

A. Background
In the late 1800s, extensive logging took place in the ceded territory, which in Wisconsin includes approximately the northern third of the state. Wisconsin's sawmilling *1266 industries harvested over 3.5 billion board feet of lumber. By the early 1900s, the lumber supply was exhausted and the industry moved out of Wisconsin, leaving behind cutover land that was barren and largely unproductive. In the 1920s, uncontrolled forest fires destroyed the remaining timber resource. Large areas of "sodbound" land inhibited the growth of new trees.
Up until the late 1920s, the state owned fewer than 30,000 acres of forest land and its forest management program was limited to fire protection. This changed in the late 1920s and early 1930s with the establishment of the Northern Highland-American Legion and Flambeau River State Forests. The state now owns approximately 370,000 acres of forest land within the ceded territory, and intends to acquire more.
Also in the 1930s, Wisconsin counties began enrolling hundreds of thousands of acres of cutover forest land in the county forest program. Through direct purchase, trade or tax deeds, the counties acquired private lands that they made productive through intensive planting and reforestation efforts and sound management techniques. The counties now own approximately 2,200,000 acres of county forest land, of which 1,800,000 are located in the ceded territory. These lands are managed pursuant to Wis.Stat. § 28.11, under the direction of the governing county board and county forestry committee, with funding provided by the county boards through tax dollars supplemented by timber sale revenues.
National forests in the ceded territory cover approximately 1,400,000 acres. They are managed by the federal government, which also manages the forest lands on plaintiffs' reservations through the Bureau of Indian Affairs pursuant to 25 C.F.R. Part 163, et seq.

B. Forest Growth
The seventeen different habitat types in the ceded territory support about eight different kinds of climax forests, including white pine, hard maple, and hemlock. (A climax forest is one that will regenerate itself under its own canopy without any kind of disturbance.)
If a site is clear cut and left on its own without management, it may be 150 years before mature maples will be present and up to 200-300 years before there will be mature hemlocks. It will take approximately 150 years of management to attain a uniform class distribution of aspen and about 250 years to do the same for oak.
In the natural succession process of forest growth, a site is first invaded by pioneer species which are eventually replaced by climax species that cannot tolerate the high temperatures and drought of open lands but require the cooler and moister soils that occur under the canopy of the pioneer species. Thus, for example, the existence of a few sugar maples on otherwise cleared land would not ensure the reproduction of a maple forest. The trees would produce seed, but the prevailing conditions would not enable the seed to regenerate. In a maple forest, however, sugar maple will regenerate itself underneath its own shade. Forest managers may manipulate the successional trend (that is, accelerate or decelerate the growth of particular species) through application of silvicultural treatments such as selective cutting or clear cutting.

C. Management

1. The state
The state manages its forests for timber production, for the enhancement of wildlife and fish, for aesthetic, historical, scientific and recreational uses, and for other purposes. It employs the "sustained yield" management technique, that is, the development and management of the forest to obtain recurrent forest crops that permit regular harvests of a portion of the trees without depletion of the population. The Wisconsin Department of Natural Resources employs approximately 230 persons to perform the activities necessary to the development of commercial stands of timber, including tree planting, cultural treatments, timber stand improvements, fire prevention and fire fighting and insect control.
*1267 The department spent $3,500,000 to collect the reconnaissance data for an initial forest inventory that is updated annually with an expenditure of over 7,350 hours of reconnaissance work by staff.
The department has planted 80,000,000 trees over 70,000 acres since the early 1900s, at a total cost of approximately $910,000,000. It spends approximately $2.55 an acre for forest management including fire protection costs. Champion International, a major forest products producer, spends about $2.60 an acre.

2. The counties
Like the state, the counties develop and manage their forest lands on a sustained yield basis. The county board of each county employs a county forest administrator to manage the county forest lands in accordance with the objectives of Wis.Stat. § 28.11, the county's ten-year plan and an annual work plan, which includes a schedule of tracts to be harvested, a listing of silviculture projects for the coming year, and a listing of estimated expenditures for work projects, administration and protection of the forest.
The county forest administrator's duties include deciding which stands or individual trees need harvesting; identifying and marking the trees and the stands to be harvested; preparing timber sale prospectuses that set forth the terms and conditions of the sale (including an appraisal of the value of the timber to be harvested); meeting with the winning bidder before logging begins to advise of procedures to be followed; and monitoring the harvesting to ensure that it is carried out in compliance with the prospectus terms. The county forest administrator ensures that boundaries are observed, good logging practices are followed, and that no trees are taken that were not intended for harvest. The administrator uses the ten-year plan and a "compartment reconnaissance" to schedule management activities such as planting, harvesting and timber stand improvement (thinning, release and pruning). Effective performance of these duties requires a trained and capable administrator.
Funds for managing the county forests come from timber sales revenues and tax dollars, and from money borrowed from the state under the Forest Aid Loan Program, which the counties repay through a 20% severance tax on all timber harvested on county lands.
From 1984 through 1988, the counties expended the following amounts for management of the county forest lands: $2,795,169 (1984); $2,872,192 (1985); $3,053,571 (1986); $3,053,356 (1987); and $3,155.688 (1988). The counties' average expenditure is about $1.43 to $1.89 an acre for management and protection of the county forest lands.
Since 1934 the 28 counties that operate forests have planted approximately 228,000,000 trees. They are now planting approximately 3,000,000 trees a year. The counties engage in planting programs because they cannot count on natural reproduction of a particular stand and because planting increases the chance of establishing a particular species.

3. The tribes
The plaintiffs' reservation forest lands are managed for sustained yield and perpetuation of the timber resource. The Bureau of Indian Affairs foresters undertake management activities similar to those engaged in by county foresters on county forest lands, which include timber stand improvement, forest inventories, timber sales establishment, timber administration and reforestation. The Bureau spends approximately $2.30 an acre on forest management.

D. Timber Sales
In any year, the Wisconsin Department of Natural Resources may conduct approximately forty to fifty new timber sales. These sales cover an annual average of 6,000 acres of the four state forests in the ceded territory, produce about 50,000 cords of wood, and generate approximately $800,000 annually in revenues that are returned to the DNR's conservation fund earmarked for forestry use.
The counties conduct many more sales overall than the state does. The counties *1268 plan their timber sales as part of their management of the forest lands: to ensure that timber is harvested while it is still in its prime or when it is necessary to thin a particular stand or permit the establishment of a new stand. The counties have annual allowable cuts that must be performed in order to achieve a sustained yield and conservation of the timber resource.
The primary purpose of harvesting is the regeneration of the next stand of trees. Cutting establishes the condition for this to recur. It allows the control of age class distribution, an essential factor in regenerating new growth and achieving a sustained yield, and it can speed up the natural successional trend from pioneer species of trees to climax species. Underharvesting can have adverse consequences for conservation.
The counties publicize their timber sales through prospectuses prepared for each tract that is to be harvested. The prospectus shows the geographic location of the tract, an estimate of the volume of wood of each particular species on the site, and the value for each unit (usually a cord) of each species. In addition, it sets out the conditions of the logging operation, such as the months in which logging can take place, the trees that are to be left, etc.
The total appraised value on the prospectus is the floor for bidding. For example, a particular tract might have an estimated 50 cords of aspen appraised at $4.20 a cord, 50 cords of jack pine at $11.20, 40 cords of mixed northern hardwoods at $3.50, 40 cords of balsam at $1.20, and 55 cords of spruce at $4.30. The minimum bid on such a prospectus would be $1194.50. Typically, the winning bid will range from 10% to 25% over the appraised value or minimum bid.
From 1984 through 1988, the counties received timber sales revenues of $3,037,530 (1984); $3,002,887 (1985); $3,480,324 (1986); $3,319,563 (1987); and $3,527,322 (1988).
Timber-consuming industries need a steady flow of raw materials. Approximately 8,000 people in Wisconsin work in the logging industry; approximately 80,000 work in the primary wood-using industry, such as in sawmills, and approximately 215,000 are employed in the secondary wood-using industry, such as in furniture manufacturing.

E. The Resource
Commercial timber is a unique and specific resource consisting of a collection of trees of a size, quality and density that make them valuable for harvesting. The particular species is of minimal importance; it is the whole tract that the logger takes into account in deciding whether the market value of the timber will exceed the cost of removing it from the lot and delivering it to the mill.
Commercial loggers want the type of forest management that will produce the most valuable timber per tract on a steady, reliable basis so that they can depend on regular annual harvests.
Perpetuating the commercial timber resource requires more than simply leaving a minimum number of trees unharvested in any given year. It requires management of the entire forest on a sustained yield basis. The mere preservation of one tree of a species or of small stands of trees will not permit the yearly harvest of merchantable timber that both Indian and non-Indian loggers want.

F. Miscellaneous Forest Products
Under the state's and counties' proposed regulations (§ NR 13.52 and proposed county regulation section 5), treaty rights participants will be required to obtain a permit from the county in order to gather firewood, tree bark, maple sap, lodge poles, boughs, marsh hay, or other miscellaneous forest products. The permit applicant will have to come to the forester's officer for the permit so that the forester can show the permittee the areas in which the specific miscellaneous products may be harvested and explain the conditions under which harvesting may take place. The forester will have up to 14 days in which to respond to a request for a miscellaneous products gathering permit from a treaty rights harvester *1269 and no deadline for responding to requests from non-treaty rights harvesters.
Gathering miscellaneous forest products can cause damage to the timber resource and to miscellaneous forest products. For example, maple syrup tapping causes staining of the tree, decreasing the value of the wood, and bark stripping may result in the death of the tree.

G. Evidence and Findings at LCO III Trial
Evidence in the record at the LCO III trial shows that at the time of the treaties, the Chippewa used a variety of plants and plant materials for many purposes: nutritional, medicinal, religious and magical. For example, they mixed box elder sap with sugar maple sap for a beverage; they used the root of the paper birch as a seasoner in medicine or, mixed with maple sugar, as a soothing syrup to alleviate stomach cramps; and they used bark from the wild cherry for a tea used as a remedy for coughs and colds. They used the cooked buds of the balsam poplar as a salve for cuts, wounds or bruises, the leaves of the hemlock to make a beverage, and the cambium layer of the red ash for food. The Chippewa used birch bark for the construction of canoes and containers of various kinds, including buckets and baskets used for cooking and storage, and for torches and even for books (in which they rendered the orders of their ceremonies in iconographs). They sealed these objects with gum from balsam fir and sewed them together with jack pine roots. For home building they used birch bark, cedar bark and matting made from cattail stalks. They used firewood for fuel. They traded or sold canoes, birch bark and maple syrup.

OPINION
In Judge Doyle's opinion in LCO III, 653 F.Supp. 1420, he found as fact that the Chippewa exploited virtually every resource in the ceded territory, including numerous species of trees (which he listed individually).[1]Id. at 1426-27. Judge Doyle held that the plaintiffs have the right to exploit these resources (and other plant, animal and fish species) in the ceded territory. Id. at 1430. He summarized his conclusions as follows:

Nature of the usufructuary rights. These rights today include rights to all the forms of animal life, fish, vegetation, and so on, set forth in the fact section, and use of all of the methods of harvesting employed in treaty times and those developed since.

Commercial activity. The fruits of the exercise of [plaintiffs'] usufructuary rights may be traded and sold today to non-Indians, employing modern methods of distribution and sale.
Id. at 1435. In the May 1988 order denying defendants' motion for partial summary judgment on the scope of plaintiffs' off-reservation usufructuary right to harvest timber, I found that Judge Doyle's recognition of plaintiffs' right to exploit particular tree species commercially encompassed a right to log timber, although I noted that Judge Doyle "did not refer specifically in the opinion to the commercial harvesting of timber, and did not find as fact that the plaintiff tribes were engaging in such harvesting at the time of the relevant treaties." Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, No. 74-C-313-C, slip op. at 2 (W.D.Wis. May 27, 1988).
Defendants contend that Judge Doyle's omissions are more important than I acknowledged in 1988. They argue that Judge Doyle never intended to recognize a right in the plaintiffs to harvest a commercial timber resource and that I misread his order in reaching that conclusion. Nothing in the record supports my reading, defendants maintain, whereas the evidence of the treaty negotiations and plaintiffs' customary activities at the time supports the *1270 opposite conclusion: that plaintiffs did not reserve any rights in the commercial timber resource, but sold them in the treaties of 1837 and 1842. Alternatively, defendants argue that if Judge Doyle did intend to recognize such a right, it was because he never had an opportunity to focus specifically on the question whether plaintiffs intended to reserve a commercial logging right under the treaties.
As I have noted, plaintiffs object to reopening the question that they maintain was resolved in LCO III, 653 F.Supp. 1420, and in my May 1988 order, and they contend that the evidence does not establish that they sold all of their timber rights; at best, it establishes that they sold their rights to harvest the standing pine but reserved their rights to exploit commercially the second growth of pine and all standing timber other than pine. They argue also that the record developed before Judge Doyle supports their claim that they were exploiting the timber resource commercially in 1837.
The entire focus of the phase one proceedings before Judge Doyle was to determine the nature and scope of the usufructuary rights reserved by the Chippewa in the 1837 and 1842 treaties. The task was to construe the treaties as the Indians would have understood them. LCO III, 653 F.Supp. at 1429 (citing Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675-76, 99 S.Ct. 3055, 3069-70, 61 L.Ed.2d 823 (1979)). To do so, it was necessary to consider the practices and customs of the Indians at the time the treaty was negotiated, the history of the treaty, the negotiations that preceded it, and the practical construction given the treaty by the parties. See United States v. Top Sky, 547 F.2d 486, 487 (9th Cir.1976).

Evidence of Chippewa Customs and Practices
Ascertaining what the Chippewa were actually doing at the time of the treaties is a prerequisite to determining what they would have understood they were reserving. See, e.g., Kimball v. Callahan, 493 F.2d 564, 565 (9th cir.), cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974) (specific treaty provision reserving Klamath Indians' exclusive right to fish could be read as not reserving a right to hunt if it were not for evidence of "highly significant role that hunting and trapping played (and continue to play) in the lives of the Klamaths"). See also United States v. Michigan, 471 F.Supp. 192, 213 (W.D.Mich. 1979), aff'd, 653 F.2d 277 (6th Cir.1981):
... [N]ot every treaty of cession leaves the Indian grantor with reserved fishing rights. In order for the right to exist in the first instance, it must be shown that the Indians were in fact using the resource, i.e., that they exercised this right, subsumed within their larger, aboriginal right to their land and water. Thus, the factual predicate for the reserved fishing rights is the documented historic, ethnohistoric, anthropologic and archaeologic evidence proving that commercial and subsistence fishing was of significance to the Indians during treaty times.
The evidence before Judge Doyle showed that at the time of the treaties, the Chippewa used particular species of trees for a myriad of purposes. The evidence did not show that the Chippewa exploited a timber resource, either for their own use or for commercial purposes. That distinction is a critical one.
As the regulatory phase timber trial established, commercial timber is a unique and specific object of harvesting. Harvesters of commercial timber look for a collection of trees of a size, quality and density that make them valuable to harvest. This is not what the Chippewa harvesters were interested in exploiting at treaty time. They were seeking particular trees for their unique characteristics, for example, the gum of the balsam or the roots of the jack pine. They did not harvest trees for use as logs or for saw boards.
The record before Judge Doyle contained no evidence that in 1837 or 1842 the Chippewa were harvesting and using timber. There is no evidence to suggest that at that time the Chippewa would have had the equipment, knowledge and skills necessary *1271 to take timber from the forest, or that they would have even contemplated doing so.[2]
Logging large areas of trees would have had no purpose for the Chippewa: their mobile hunting and gathering lifestyle gave them no reason to build log homes or barns or to clear the land. To the contrary, they depended heavily on retaining many different species of trees and other forms of plant life from which they derived many specialized products and which served as habitat for the animals they hunted.
Plaintiffs argue that the lack of evidence of logging activity in 1837 and 1842 is not determinative of their right to engage in this form of harvest. They argue that it is necessary only to prove that they were exploiting trees for some commercial purpose at treaty time because the law of the case is that plaintiffs may use any harvesting methods employed in 1837 and 1842 and developed since, and logging is simply an advanced form of harvesting. Therefore, they maintain, they may apply logging techniques to the forest resources they were exploiting in other ways at treaty time.
When I denied the state defendants' motion for partial summary judgment in May 1988, I adopted this argument by implication. I find it unconvincing now. As I have explained, commercial timber is a unique resource; it is not the same thing as particular species of trees, such as those included in Judge Doyle's careful enumeration of the resources the Chippewa were exploiting at treaty time. Moreover, the harvesting of this resource cannot be characterized as merely a modern adaptation of a traditional harvesting method. Logging is not a "modern" technique, but rather one that has been in use for centuries, and it is an activity that is wholly different in purpose and effect from utilizing parts of trees for specialized purposes.
The uses the Chippewa made of trees in 1837 and 1842 were essentially uses that preserved the living trees. They did not take the trunk of the tree that loggers concentrate on; they used the sap, bark, branches, leaves, needles and roots. Even when they used wood in large quantities as fuel for their extensive maple sugar and syrup-making it is reasonable to assume that they used fallen, dry logs for this purpose rather than green living trees. This use of forest products contrasts sharply with commercial logging, which destroys the forest resource unless it is managed carefully as an element of an overall silviculture plan.
In short, I find that at treaty time, the Chippewa were not exploiting timber for their own use or for commercial purposes, although they were exploiting the various species of trees in the forest for a multitude of purposes other than for timber. I find and conclude also that commercial logging is not simply a modern means of harvesting but an entirely different activity from any the Chippewa engaged in at treaty time.

Treaty Evidence
Defendants argue that it would be wholly inconsistent for plaintiffs to argue that they retained a right to harvest timber commercially when the law of the case is that the Chippewa understood in 1837 and 1842 that they were selling the United States their timber and the right to harvest it. Defendants are correct that both this court and the Court of Appeals for the Seventh Circuit have held that the Chippewa understood they were ceding their rights to the pine timber when they entered into the treaties. See United States v. Bouchard, 464 F.Supp. 1316 (W.D.Wis. 1978), rev'd on other grounds sub nom. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt (LCO I), 700 F.2d 341 (7th Cir.) cert. denied, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983), in which Judge Doyle found as fact that at the council grounds in July 1837, Commissioner *1272 Dodge "told the chiefs that the area [the government wished to purchase] was barren of game and not good for agriculture, but it `abounded in pine timber, for which their Great Father the President of the United States wished to buy it from them, for the use of his white children ...'" Id. at 1322. See LCO I, 700 F.2d at 363: in 1837 and 1842 the "Chippewa then believed that they were merely granting the United States a right to the timber and minerals that were the primary impetus for Governmental interest in the land".
Plaintiffs maintain that defendants' citations to Bouchard and to LCO I are not relevant because the statements in those opinions were made in a different context: addressing the nature of the Indians' cession rather than the content and scope of plaintiffs' reserved usufructuary rights. In other words, the statements focus on what the Indians were relinquishing in the treaties of 1837 and 1842, not on what they understood they were retaining.
Also, plaintiffs deny that the Chippewa understood prior to 1854 that they were selling timber. Plaintiffs quote the statement of Chief Buffalo at the time of the 1854 treaty: "`We now understand that we are selling our lands as well as our timber and that the whole with the exception of what we shall reserve goes to the great father forever.'" Bouchard, 464 F.Supp. at 1331. They cite as well a 1982 report prepared by one of their experts, James A. Clifton, in which Clifton describes the confusion following the 1837 treaty negotiations:
2. However, there was certainly a great deal of ambiguity and confusion during the [1837] negotiations. Certainly, the Chippewa negotiators left St. Peter's convinced that they had sold Americans only the right to cut the standing pine timber in area 242 [the area covered by the 1837 treaty], and temporary use of the lakes and streams for logging purposes.... There is little evidence that Dodge made much effort during the negotiations to clarify these confusions and ambiguities.
3. It is doubtful if more than a few Chippewa from bands occupying and claiming area 242 had any understanding of what was being transacted. Very few were present; they did not participate actively in the negotiation; and Dodge made no special effort to insure that they understood what he wanted or to secure their agreement.
Dkt. No. 30 at 16. (This report was never introduced into evidence in this court by either side, although plaintiffs submitted it as part of a motion to supplement the record sent to the court of appeals in connection with plaintiffs' appeal from the decision in Bouchard, 464 F.Supp. 1316.)
As defendants point out, however, even if the Chippewa were uncertain in 1837 or 1842 whether they had sold their pine timber to the United States, they knew in 1854 that they had done so. Plaintiffs concede that they understood then that they were selling their timber. Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Timber Claim at 13. See also statement of Martin, head chief of the Ottawa or LacCourtorielle [sic] bands, as reported to Gov. J.D. Doty by LaPointe Indian Agent Alfred Brunson, Jan. 6, 1843: "[The Chippewa] have no objection to the white mans working the mines, and the timber and making farms, but we reserve the Birch bark and ceder, for canoes, the Rice and the sugar tree and the priviledge of hunting without being disturbed by whites." Plaintiffs' Exh. 29A at LCO III trial.
Even if I were free to ignore the court of appeals' characterization of the treaties, I am not persuaded by plaintiffs' citations that the Chippewa did not understand by 1854 that they had sold their standing pine to the United States.
Plaintiffs have a somewhat stronger argument to the effect that the Chippewa never understood that they were selling timber resources other than pine, such as hardwoods. In support of this argument, they quote a statement made by Ma-ghe-ga-bo at the 1837 treaty negotiations.
Ma-ghe-ga-bo: "My father. Listen to me. Of all the country that we grant *1273 you we wish to hold on to a tree where we get our living, and to reserve the streams where we go [&] drink the waters that give us life.... The chiefs will now show you the tree we want to reserve. This is it [placing an oak sprig upon the table near the map]. It is a different kind of tree from the one you wish to get from us...."
1837 Treaty Journal, Plaintiffs' Exh. 50 at LCO III trial, at 13. Plaintiffs argue that Ma-ghe-ga-bo's statement shows that the Indian understanding was that the tribes would retain the right to log all timber in the ceded territory other than pine.
It is possible that plaintiffs are correct in arguing that the Chippewa never understood that they were selling all of the timber, not just their pine forests, even in 1854.[3] The difficulty is that plaintiffs never made this argument before Judge Doyle during the first phase of this litigation focusing on the scope and nature of plaintiffs' reserved rights, when the parties could have produced evidence on the point and when Judge Doyle could have addressed it. The present record does not permit an informed evaluation of the basis for plaintiffs' argument. There is no evidence, for example, of reasons why the Chippewa would have considered pine timber and other timber to be distinct or would have believed the United States to be interested only in the pine.
Plaintiffs make the additional argument that even though the Chippewa knew they were selling the standing pine, they understood they would be able to harvest the "second growth." They quote from the 1837 Treaty Journal again:
Flat Mouth: "My Father. Your children are willing to let you have their lands, but they wish to reserve the privilege of making sugar from the trees, and getting their living from the Lakes and Rivers, as they have done heretofore, and of remaining in [the] country. It is hard to give up the lands. They will remain and cannot be destroyed  but you may cut down the trees, and others will grow up."
Plaintiffs' Exh. 50 at LCO III trial at 16.
Again, plaintiffs never made this argument at the phase one trial, when evidence could have been adduced that might explain how such an understanding on the part of the Chippewa could be reconciled with the evidence that the sale was permanent. See Bouchard, 464 F.Supp. at 1322-23: [At 1837 treaty negotiations], Commissioner Dodge responded, saying [to the Chippewa] that "the `Great Father' never buys land for a term of years...."
Without the evidence that might support plaintiffs' contention that they were selling only the first-growth pine, I could not find that this was their understanding. It seems unlikely that it was in view of the lack of any evidence that the Chippewa exploited the timber resource at this time. It is much more plausible to read the quoted statements as referring to the Chippewa's desire that enough trees be left to enable them to continue to hunt in the woods and gather the forest products they needed, rather than to read them as reserving a right to harvest non-pine timber or second-growth timber.

Plaintiffs' Admissions
Defendants argue that plaintiffs cannot dispute the purpose of the treaties because they have consistently characterized the 1837 treaty as a "lumbermen's" or "timber treaty," thus admitting that its purpose was to buy timber and demonstrating how *1274 unlikely it is that plaintiffs thought they were retaining a right to harvest a commercial timber harvest. See, e.g., Report of James Clifton, Dkt. No. 30, prepared in 1982:
The 1837 Treaty of St. Peter's is known to historians as a "lumbermen's" transaction by virtue of American concerns with gaining access to and control of the vast virgin pine forest along the upper Mississippi River and its tributaries.
Id. at 13.
See also Complaint filed before the Indian Claims Commission in Minnesota Chippewa Tribe v. United States, No. 18-C, filed Aug. 9, 1949 (Exh. 2 to Defendants' Motion for Partial Summary Judgment, Dkt. No. 777), at p. 19: "The Indians did not understand the terms of the treaty they signed [in 1837]. They understood that only the pine timber was sold and the rights to the land were disposed of for a term of years only." (One of the commission's findings was that the cession was taken from the Chippewa for the principal purpose of acquiring the area for logging. Minnesota Chippewa Tribe v. United States, 26 I.C.C. 22, 39 (July 21, 1971).)[4]
It is not determinative of this issue that both plaintiffs and the courts have viewed the 1837 and 1842 treaties as ones in which all the parties understood the Indians were relinquishing their rights to the standing pine and the government was acquiring those rights forever for its "white children," but it is consistent with the conclusion that the Chippewa did not contemplate the reservation of a right to harvest timber that they knew they were selling to the United States.

Unjust Enrichment
Defendants contend that at treaty time the Chippewa anticipated they would be self-sufficient and living off the natural resources in the ceded territory, not off the fruits of others' labors. Defendants argue that because the evidence at the timber trial established that the state's and counties' forest resources are the product of silvicultural practices that involve the planting, tending, and improvement of tree crops, it would be inconsistent with the Chippewa understanding to permit plaintiffs to live off the state's and counties' investment of time and money in their timber resource. For this reason alone, defendants argue, plaintiffs have no treaty-guaranteed right to take the timber harvest, any more than they would have right to harvest a state-grown corn or sour cherry crop.
Because I have found that plaintiffs did not contemplate reservation of a right to exploit the timber resource for their own subsistence or for commercial purposes, it is unnecessary to address defendants' argument that recognition of such a right would constitute unjust enrichment, an inequitable remedy in an equitable proceeding. However, I agree with defendants that the nature of the timber resource makes it much more like a farm crop than a naturally-recurring resource. This is another reason why logging cannot be characterized as simply a modern adaptation of a traditional harvesting activity engaged in by the Chippewa.

Additional Reasons for Dismissal of Plaintiffs' Claims
Defendants argue that the court should dismiss plaintiffs' claim to a treaty-protected right to harvest timber commercially because plaintiffs' gathering rights were temporary in nature and have been extinguished on those lands that have been privately owned at any time, even if they are now held publicly. This issue has been discussed at length in other opinions issued by Judge Doyle, LCO III, 653 F.Supp. at 1430-33; Bouchard, 464 F.Supp. at XXXX-XXXX; by me, Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, slip op. at 2-7 (W.D.Wis. Jan. 11, 1988); and by the Court of Appeals *1275 for the Seventh Circuit, Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin (LCO II), 760 F.2d 177, 179-183 (7th Cir.1985); LCO I, 700 F.2d at 364 n. 14. There is no good reason to take it up again. To the extent it is confined to the commercial timber resource, it is moot in the light of the ruling that plaintiffs did not retain a usufructuary right to take commercial timber.
In a related argument, the state defendants maintain that because timber is held by the state in a proprietary capacity, it is not subject to plaintiffs' treaty-protected harvesting rights as are the fish and wild animals that are held by the state as trustee of a sovereign trust. As the bona fide purchasers of property for value, defendants argue, the state and counties have the same propriety rights in the timber attached to their land as do any other good faith purchasers of real estate.
The holding that plaintiffs do not have a reserved treaty right to harvest timber commercially makes it unnecessary to reach this argument, or defendants' final arguments that plaintiffs should be required to exhaust their timber harvesting opportunities on federal lands before they seek harvests on state and county forest lands, and that Indian harvesting would be incompatible with the conservation of the resource.

Regulation of Reserved Usufructuary Right
The conclusion that plaintiffs did not reserve a usufructuary right to harvest timber commercially when they entered into the treaties of 1837 and 1842 disposes of the issue of the extent to which the state and county may impose regulations on the plaintiffs' exercise of a reserved usufructuary right to harvest commercial timber. It leaves for determination only the question of the extent to which the state and counties may regulate plaintiffs' undisputed usufructuary right to gather forest products.
In § NR 13.52 and proposed county regulation 5, defendants propose a permit system for the gathering of miscellaneous forest products, such as lodge poles, maple syrup, tree bark, firewood and marsh hay, under which defendants would issue a permit for the requested product within fourteen days of a tribal request. Under plaintiffs' proposal set out in their Off-Reservation code at OR § 11.03(1)(b), the tribes or a designated intertribal entity would serve as the authority that would issue permits for the gathering of forest products. The permits might incorporate the landowners' harvesting conditions, but the regulations do not require that they do so. OR § 11.02(4).
Plaintiffs' proposed regulations do not make explicit the manner in which the tribal permits would be administered or how plaintiffs would implement and regulate gathering activities on state or county land. Plaintiffs have not elaborated further on their proposal in their brief. This lack of specificity does not provide any assurance that the tribes would ensure that their members' gathering activities are consistent with the state's and counties' valid conservation goals.
Plaintiffs raise two objections to defendants' proposed permit system. First, they argue that under Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942), the state cannot require treaty harvesters to purchase a license to exercise their treaty-guaranteed rights. Tulee holds that a state is precluded from charging treaty rights participants licensing fees to be used for the general support of state government. Neither the state nor the counties have proposed a fee for the gathering of miscellaneous forest products. Thus, Tulee is irrelevant.
Plaintiffs' second objection is a generalized one to the fourteen-day waiting period as failing the "least restrictive alternative" test. They make only a conclusory argument that "at least in some circumstances," the period is too long. They do not specify the particular circumstances in which this would be true. Plaintiffs' Post-trial Timber Brief at 56-57.
In the absence of any specific suggestion by plaintiffs for a less restrictive alternative, I conclude that the provisions proposed *1276 by defendants meets the test for state regulation established in LCO IV, 668 F.Supp. 1233, which is that any regulation must be reasonable and necessary for conservation and may not discriminate against the Indians.
As regulations of general application to a wide variety of gathering activities, some of which pose a serious potential threat to the resource, § NR 13.52 and proposed county regulation 5 are reasonable and necessary and do not discriminate against the Indians.

ORDER
IT IS ORDERED that defendants' motion for reconsideration of the May 1988 order denying their motion for clarification of LCO III, 653 F.Supp. 1420, is GRANTED; the May 1988 order is VACATED. Defendants' motion for clarification of LCO III is GRANTED: I hold that Judge Doyle did not find, implicitly or explicitly, that plaintiffs have a reserved usufructuary right to harvest the commercial timber resource in the ceded territory.
Because plaintiffs did not reserve a usufructuary right to harvest the commercial timber resource under their treaties with the United States, defendants may regulate plaintiffs' harvesting of this resource in the same manner they regulate the non-Indian harvest. With respect to the regulation of plaintiffs' treaty-protected usufructuary right to gather miscellaneous forest products, the state defendants and the county intervenors may impose a permit requirement and a fourteen-day response time for the issuance of such permits, as set forth in Wis.Admin.Code § NR 13.52 and county regulation 5.
NOTES
[1] The tree species include box elder, sugar maple, yellow birch, white oak, bur oak, red oak, black oak, red ash, white pine, hemlock, large-toothed aspen, red maple, paper birch, black ash, balsam fir, tamarack, black spruce, jack pine, Norway pine, arbor vitae (white cedar), balsam poplar, quaking aspen, beech, shell back hickory [also known as shagbark hickory], butternut and crack willow. LCO III, 653 F.Supp. at 1427.
[2] Judge Doyle refused to admit into the record evidence that in 1873 the Chippewa were producing and selling lumber, shingles and rails and that they were employed in cutting wood and sawing logs. Plaintiffs' expert conceded that this activity did not begin before 1873. Judge Doyle held that the evidence had no probative value on the question of Indian activity in 1837 and 1842. Transcript of trial, Dec. 11, 1985, Dkt. No. 376 at 117-18.
[3] In his 1982 report, which is not in evidence, plaintiffs' expert, James Clifton, noted that the logging of hardwoods in the ceded territory was delayed until 1904 "due to the lack of accessible railroad transportation, needed because the hardwood logs could not be rafted downstream to the mills [as the pine logs could]." Dkt. No. 30 at 56. Clifton notes in the same report that in 1837 the most important game animal to the Chippewa was the white-tailed deer, which was most abundant in the southern reaches of the territory and found only infrequently in heavily forested regions, particularly the pine forests. Id. at 7. If Clifton's observations are correct, they support the idea that when "timber" was discussed, the parties would have been thinking only of the pine forests. They also explain why Ma-ghe-ga-bo was concerned about retaining the hardwood forests, which provided not only the bark, sap, firewood, and wood for canoe paddles needed by the Chippewa, but a more favorable habitat for animal life.
[4] Defendants cite several instances in which plaintiffs made similar admissions in briefs filed with the Court of Appeals for the Seventh Circuit when this case was on appeal. However, those briefs are not part of the record in this court and I am unable to determine whether the statements were made.